CORT ET AL. *v.* ASH

No. 73–1908.   Argued March 18, 1975—Decided June 17, 1975

*Edwin P. Rome* argued the cause for petitioners. With him on the briefs were *Jerome R. Richter, Richard P. McElroy, William H. Roberts,* and *Curtis H. Barnette.*

*David Berger* argued the cause for respondent. With him on the brief were *Cletus P. Lyman* and *Paul J. McMahon.**

---

*\*Solicitor General Bork, Acting Assistant Attorney General Keeney,*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

There are other questions, but the principal issue presented for decision is whether a private cause of action for damages against corporate directors is to be implied in favor of a corporate stockholder under 18 U. S. C. § 610, a criminal statute prohibiting corporations from making "a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors . . . are to be voted for."[1] We con-

___

and *Jerome M. Feit* filed a brief for the United States as *amicus curiae.*

*James F. Rill, Thomas F. Shannon, John Hardin Young, Milton A. Smith,* and *Lawrence B. Kraus* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

*Alan B. Morrison* and *Reuben B. Robertson III* filed a brief for Judith Bonderman et al. as *amici curiae* urging affirmance.

[1] Title 18 U. S. C. § 610 (1970 ed. and Supp. III) provided in part as follows when this suit was filed:

"Contributions or expenditures by national banks, corporations or labor organizations.

"It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section.

"Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer of any labor organization, who consents to any contribution

clude that implication of such a federal cause of action is not suggested by the legislative context of § 610 or required to accomplish Congress' purposes in enacting the statute. We therefore have no occasion to address

or expenditure by the corporation or labor organization, as the case may be, and any person who accepts or receives any contribution, in violation of this section, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if the violation was willful, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

.        .        .        .        .

"As used in this section, the phrase 'contribution or expenditure' shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section; but shall not include communications by a corporation to its stockholders and their families or by a labor organization to its members and their families on any subject; nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and their families, or by a labor organization aimed at its members and their families; the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation or labor organization: *Provided,* That it shall be unlawful for such a fund to make a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other monies required as a condition of membership in a labor organization or as a condition of employment, or by monies obtained in any commercial transaction."

Definitions of various terms in § 610 are included in 18 U. S. C. § 591 (1970 ed., Supp. III).

The Federal Election Campaign Act Amendments of 1974, Pub. L. 93–443, 88 Stat. 1263, §§ 101 (e), 102, increased substantially the fines for violation of § 610 and changed many of the definitions in § 591 of the terms used in § 610.

the questions whether § 610, properly construed, proscribes the expenditures alleged in this case, or whether the statute is unconstitutional as violative of the First Amendment or of the equal protection component of the Due Process Clause of the Fifth Amendment.

## I

In August and September 1972, an advertisement with the caption "I say let's keep the campaign honest. Mobilize 'truth squads' " appeared in various national publications, including Time, Newsweek, and U. S. News and World Report, and in 19 local newspapers in communities where Bethlehem Steel Corp. (Bethlehem), a Delaware corporation, has plants. Reprints of the advertisement, which consisted mainly of quotations from a speech by petitioner Stewart S. Cort, chairman of the board of directors of Bethlehem, were included with the September 11, 1972, quarterly dividend checks mailed to the stockholders of the corporation. The main text of the advertisement appealed to the electorate to "encourage responsible, honest, and truthful campaigning." It alleged that vigilance was needed because "careless rhetoric and accusations . . . are being thrown around these days—their main target being the business community." In italics, under a picture of Mr. Cort, the advertisement quoted "the following statement made by a political candidate: 'The time has come for a tax system that says to big business—you must pay your fair share.' " It then printed Mr. Cort's rejoinder to this in his speech, including his opinion that to say "large corporations [are] not carrying their fair share of the tax burden" is "baloney." The advertisement concluded with an offer to send, on request, copies of Mr. Cort's entire speech[2] and a folder "telling how to

---

[2] The speech was a general defense of "big business" and the

go about activating *Truth Squads.*[3]   These publications could be obtained free from the Public Affairs Department of Bethlehem.   It is stipulated that the entire costs of the advertisements and various mailings were paid from Bethlehem's general corporate funds. App. A29–A30; 350 F. Supp. 227, 229 (ED Pa. 1972).

Respondent owns 50 shares of Bethlehem stock and was qualified to vote in the 1972 Presidential election. He filed this suit in the United States District Court for the Eastern District of Pennsylvania on September 28, 1972, on behalf of himself and, derivatively, on behalf of Bethlehem.   The complaint specified two separate and distinct bases for jurisdiction and relief.   Count I alleged jurisdiction under 28 U. S. C. § 1331 and sought to state a private claim for relief under 18 U. S. C. § 610, which, as mentioned, in terms provides only for a criminal penalty.   Count II invoked pendent jurisdiction for a claim under Delaware law, alleging that the corporate campaign expenditures were *"ultra vires,* unlawful and [a] willful, wanton and gross breach of [defendants'] duty owed to [Bethlehem]."   Immediate injunctive relief against further corporate expenditures in connection with the 1972 Presidential election or any

current tax system.   Although it named no political candidate or party, it was in large part devoted to refuting statements, which were quoted, by "a prominent presidential candidate."   The complaint in this case alleged that the "candidate" referred to was quite clearly the Democratic candidate for President at the time (George McGovern), App. A13.   The speech concluded with the suggestion that listeners "[m]obilize 'truth squads' "—organize to refute "false or deceptive" statements and "outrageous accusations."

[3] The folder was entitled: "How you can help to keep the campaign honest."   It included suggestions for informing oneself about the election, using research tools, refuting "a statement you know to be wrong," and organizing friends and neighbors to do the same. Unlike the speech and advertisement, the folder contained no quotations from any political candidate, nor any discussion of issues.

future campaign was sought, as well as compensatory and punitive damages in favor of the corporation.

The District Court denied a preliminary injunction on October 25, 1972. 350 F. Supp. 227. While the denial was supported on three grounds,[4] it was upheld on appeal to the Court of Appeals for the Third Circuit only on the narrow ground that irreparable harm was not shown. 471 F. 2d 811 (1973).[5]

After the affirmance on appeal, petitioners sought an order requiring respondent to post security for expenses as required by Pennsylvania law. The court declined to order such security with regard to the federal cause of action alleged in Count I, but did order respondent to post $35,000 before proceeding with the pendent claim under Count II. Rather than post security, respondent filed an amended complaint, which dropped Count II, the separate state cause of action, from the case.[6]

---

[4] First, the District Court held that the penal sanctions provided in § 610 are exclusive, and no private cause of action is to be implied. 350 F. Supp., at 231. Second, the District Court held that "the purpose of the advertisement was not to influence the election of a specific candidate," and therefore that "the payment for the advertisement did not constitute an 'expenditure' within the meaning of . . . Section 610." *Id.*, at 231–232. Third, the court found that "[i]n failing to prove a likelihood of success on the merits, plaintiff has failed to prove that irreparable harm would result if an injunction is not granted." *Id.*, at 232.

[5] In affirming, the Court of Appeals observed that while the District Court's opinion seemed to preclude respondent from any ultimate relief, the opinion addressed only a request for preliminary relief and therefore had to be considered only tentative, leaving respondent free to renew his contentions on final hearing. 471 F. 2d, at 812.

[6] Respondent seems to invite the Court, in effect, to reinstate Count II. We decline to do so. He argues, somewhat cryptically, that the order to post security "was a nullity" since "[a] court

The District Court then granted petitioners' motion for summary judgment without opinion. The Court of Appeals reversed, 496 F. 2d 416 (1974). The Court of

may not dismiss a theory of relief." Brief for Respondent 11 and n. 2. But the District Court did not dismiss the pendent state-law claim; respondent deliberately dropped it from his amended complaint. Therefore, whatever the merits of the order for security as applied only to the pendent claim, see *Sargent* v. *Genesco, Inc.*, 337 F. Supp. 1244 (MD Fla. 1972), cf. *Cohen* v. *Beneficial Loan Corp.*, 337 U. S. 541 (1949), respondent has foreclosed himself from consideration of a state claim not now raised by his operative pleading. *Wheeldin* v. *Wheeler*, 373 U. S. 647, 652 (1963). We do not think that the pendent state-law claim was preserved in these circumstances by the verbatim repetition in the amended complaint of a general allegation from the original complaint that petitioners' conduct was "in violation of state and federal law."

Therefore, there is not properly before us respondent's argument that the acts of a Delaware corporation violative of United States criminal statutes are *ultra vires* acts under Delaware corporation law, Del. Code Ann., Tit. 8, § 101; 6 W. Fletcher, Cyclopedia Corporations 335 (1968 ed.), and that his *ultra vires* cause of action therefore "arises under" federal law, that is, § 610, within the meaning of 28 U. S. C. § 1331. He relies upon *Smith* v. *Kansas City Title Co.*, 255 U. S. 180 (1921); see also *Wheeldin* v. *Wheeler, supra,* at 659–660 (BRENNAN, J., dissenting). Not only was Count II dropped from the case by respondent, and no argument addressed to it made by him in the District Court or the Court of Appeals, but he neither cross-petitioned nor raised the contention in his Opposition to the Petition for Certiorari. Moreover, this Court must necessarily depend upon the district courts and courts of appeals for initial determinations of questions of state law; indeed, our practice of deference to such determinations should generally render unnecessary review of their decisions in this respect. *Commissioner* v. *Estate of Bosch*, 387 U. S. 456, 462 (1967); *Ragan* v. *Merchants Transfer Co.*, 337 U. S. 530, 534 (1949). Obviously, then, we should not undertake to decide such questions, inherent in respondent's theory, in the first instance.

In sum, in this case "we see no cause for deviating from our normal policy of not considering issues which have not been pre-

Appeals held that, since the amended complaint sought damages for the corporation for violation of § 610, the controversy was not moot, although the election which occasioned it was past. The Court of Appeals held further that "a private cause of action, whether brought by a citizen to secure injunctive relief or by a stockholder to secure injunctive or derivative damage relief [is] proper to remedy violation of § 610." *Id.*, at 424. We granted certiorari, 419 U. S. 992 (1974). We reverse.

## II

We consider first the holding of the Court of Appeals that respondent has "a private cause of action . . . [as] a citizen [or as a stockholder] to secure injunctive relief." The 1972 Presidential election is history, and respondent as citizen or stockholder seeks injunctive relief only as to future elections. In that circumstance, a statute enacted after the decision of the Court of Appeals, the Federal Election Campaign Act Amendments of 1974, Pub. L. 93–443, 88 Stat. 1263 (Amendments) (amending the Federal Election Campaign Act of 1971, 86 Stat. 3), requires reversal of the holding of the Court of Appeals.

In terms, § 610 is only a criminal statute, providing a fine or imprisonment for its violation. At the time this suit was filed, there was no statutory provision for civil enforcement of § 610, whether by private parties or by a Government agency. But the Amendments created a Federal Election Commission, 2 U. S. C. § 437c (a)(1) (1970 ed., Supp. IV); [7] established an administrative

---

sented to the Court of Appeals and which are not properly presented for review here." *Neely* v. *Eby Constr. Co.*, 386 U. S. 317, 330 (1967); cf. *Wiener* v. *United States*, 357 U. S. 349, 351 n. (1958).

[7] A Federal Election Commission was included in the Senate-passed bill in 1971, but was eliminated in conference. See Berry &

procedure for processing complaints of alleged violations of § 610 after January 1, 1975, 2 U. S. C. § 437g (1970 ed., Supp. IV), and § 410, note following 2 U. S. C. § 431 (1970 ed., Supp. IV); and provided that "[a]ny person who believes a violation . . . [of § 610] has occurred may file a complaint with the Commission." 2 U. S. C. § 437g (a)(1)(A) (1970 ed., Supp. IV). The Commission must either investigate the complaint or refer the complaint to the Attorney General, 2 U. S. C. §§ 437g (a) (2)(A) and (B) (1970 ed., Supp. IV).[8] If the Commission chooses to investigate the complaint, and after investigation determines that "any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation" of § 610, the Commission may request the Attorney General to "institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order . . . ." 2 U. S. C. § 437g (a)(7) (1970 ed., Supp. IV). And 2 U. S. C. § 437c (b) (1970 ed., Supp. IV), expressly vests the Commission with "primary jurisdiction" over any claimed violation of § 610 within its

---

Goldman, Congress and Public Policy: A Study of the Federal Election Campaign Act of 1971, 10 Harv. J. Legis. 331, 343, 354 (1973); S. Conf. Rep. No. 92–580, pp. 34–35 (1971); H. R. Conf. Rep. No. 92–752, pp. 34–35 (1971). The Commission in the Senate version was given no explicit authority with regard to violations of § 610. See S. 382, § 308 (b), as passed Aug. 5, 1971 (3 Leg. Hist. of Federal Election Campaign Act of 1971).

[8] Other provisions of the Amendments which may have relevance to private parties' complaints of violations of § 610 include 2 U. S. C. § 437g (a)(9) (1970 ed., Supp. IV), providing for judicial review at the behest of "[a]ny party aggrieved" by any order granted in a civil action filed by the Attorney General, and 2 U. S. C. § 437h (a) (1970 ed., Supp. IV), permitting "any individual eligible to vote in any election for the office of President of the United States" to file "such actions . . . as may be appropriate to construe the constitutionality of . . . [§ 610]."

purview.[9]  Consequently, a complainant seeking as citizen or stockholder to enjoin alleged violations of § 610 in future elections must henceforth pursue the statutory remedy of a complaint to the Commission, and invoke its authority to request the Attorney General to seek the injunctive relief.  H. R. Conf. Rep. No. 93–1438, p. 94 (1974).  Thus, the Amendments constitute an intervening law that relegates to the Commission's cognizance respondent's complaint as citizen or stockholder for injunctive relief against any alleged violations of § 610 in future elections.  In that circumstance, the holding of the Court of Appeals must be reversed, for our duty is to decide this case according to the law existing at the time of our decision.

The governing rule was announced by Mr. Chief Justice Marshall in *United States* v. *Schooner Peggy*, 1 Cranch 103, 110 (1801):

"It is in the general true that the province of an

[9] The parties disagree upon whether this reference to "primary jurisdiction" suggests that a complainant, after filing a complaint with the Commission, may file a civil suit for injunctive relief if the Commission fails to cause one to be filed.  They also dispute whether the exhaustion requirement applies to a suit for damages.  Compare 120 Cong. Rec. 35134 (1974) (remarks of Mr. Hays) (suggesting that the statutory remedies are exclusive) with *id.*, at 35132 (remarks of Mr. Brademas) ("individuals or organizations who may have complaints about possible violations [must] *first* exhaust their administrative remedies with the Commission . . ." (emphasis supplied)); see also H. R. Conf. Rep. No. 93–1438, p. 94 (1974).  However, these issues are not here relevant; it suffices for the purposes of this case to hold that the statute requires that a private complainant desiring injunctive relief against alleged future violations of § 610 must at least exhaust his statutory remedy under the Amendments when and if such violations occur.  We note that the question of the availability of a private cause of action by respondent for injunctive relief may not arise at all if the Attorney General seeks and obtains injunctive relief for any claimed violations by Bethlehem.  Cf. *Richardson* v. *Wright*, 405 U. S. 208, 209 (1972).

appellate court is only to enquire whether a judgment when rendered was erroneous or not. But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional . . . I know of no court which can contest its obligation. . . . In such a case the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside."

We most recently reaffirmed the principle of *Schooner Peggy* in *Bradley* v. *Richmond School Board,* 416 U. S. 696, 711 (1974), where we said: "We anchor our holding in this case on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." There is no "statutory direction or legislative history to the contrary" in or respecting the Amendments, nor is there any possible "manifest injustice" in requiring respondent to pursue with respect to alleged violations which have yet to occur the statutory remedy for injunctive relief created by the Amendments.

### III

Our conclusion in Part II pretermits any occasion for addressing the question of respondent's standing as a citizen and voter to maintain this action, for respondent seeks damages only derivatively as stockholder. Therefore, we turn next to the holding of the Court of Appeals that "a private cause of action . . . by a stockholder to secure . . . derivative damage relief [is] proper to remedy violation of § 610." We hold that such relief

is not available with regard to a 1972 violation under § 610 itself, but rather is available, if at all, under Delaware law governing corporations.[10]

In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 39 (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e. g., National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 458, 460 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e. g., Amtrak, supra; Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412, 423 (1975); *Calhoon* v. *Harvey,* 379 U. S. 134 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin* v. *Wheeler,* 373 U. S. 647, 652 (1963); cf. *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 434 (1964); *Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U. S. 388, 394–395 (1971); *id.,* at 400 (Harlan, J., concurring in judgment).

The dissenting judge in the Court of Appeals and petitioners here suggest that where a statute provides a penal remedy alone, it cannot be regarded as creating a

[10] Although the considerations upon which we base our present decision have relevance to a similar determination under the Amendments, we imply no view whether the same result would obtain under the Amendments. See n. 9, *supra,* and n. 14, *infra.*

right in any particular class of people. "Every criminal statute is designed to protect some individual, public, or social interest. . . . To find an implied civil cause of action for the plaintiff in this case is to find an implied civil right of action for every individual, social, or public interest which might be invaded by violation of any criminal statute. To do this is to conclude that Congress intended to enact a civil code companion to the criminal code." 496 F. 2d, at 428–429 (Aldisert, J., dissenting). Cf. *Nashville Milk Co.* v. *Carnation Co.*, 355 U. S. 373, 377 (1958).

Clearly, provision of a criminal penalty does not necessarily *preclude* implication of a private cause of action for damages. *Wyandotte Transportation Co.* v. *United States*, 389 U. S. 191, 201–202 (1967); see also *J. I. Case Co.* v. *Borak, supra; Texas & Pacific R. Co.* v. *Rigsby, supra.* However, in *Wyandotte, Borak,* and *Rigsby,* there was at least a statutory basis for inferring that a civil cause of action of some sort lay in favor of someone.[11] Here, there was nothing more than

---

[11] In *Wyandotte,* it was conceded that the United States had a civil *in rem* action against the ship obstructing navigation under § 19 of the Rivers and Harbors Act of 1899, and could retain the proceeds of the sale of the vessel and its cargo. 389 U. S., at 200 n. 12. The only question was whether it also had other judicial remedies for violation of § 15 of the Act, aside from the criminal penalties provided in § 16.

In *Borak,* § 27 of the Securities Exchange Act of 1934 specifically granted jurisdiction to the district courts over civil actions to "enforce any liability or duty created by this title or the rules and regulations thereunder," and there seemed to be no dispute over the fact that at least a private suit for declaratory relief was authorized; the question was whether a derivative suit for rescission and damages was also available. 377 U. S., at 340–431. Further it was clear that the Securities and Exchange Commission could sue to

a bare criminal statute, with absolutely no indication that civil enforcement of any kind was available to anyone.

We need not, however, go so far as to say that in this circumstance a bare criminal statute can *never* be deemed sufficiently protective of some special group so as to give rise to a private cause of action by a member of that group. For the intent to protect corporate shareholders particularly was at best a subsidiary purpose of § 610, and the other relevant factors all either are not helpful or militate against implying a private cause of action.

*First,* § 610 is derived from the Act of January 26, 1907,[12] which "seems to have been motivated by two considerations. First, the necessity for destroying the influence over elections which corporations exercised through financial contribution. Second, the feeling that corporate officials had no moral right to use corporate funds for contribution to political parties without the consent of the stockholders." *United States* v. *CIO,* 335 U. S. 106, 113 (1948). See 40 Cong. Rec. 96 (1905)

---

enjoin violations of § 14 (a) of the Act, the section involved in *Borak.* See § 21 of the Act, 15 U. S. C. § 78u.

Finally, in *Rigsby,* the Court noted that the statutes involved included language pertinent only to a private right of action for damages, although such a right of action was not expressly provided, thus rendering "[t]he inference of a private right of action . . . irresistible." 241 U. S., at 40. See also *United States* v. *Republic Steel Corp.,* 362 U. S. 482, 491 (1960).

[12] The Act provided:

"[It] shall be unlawful for any national bank, or any corporation organized by authority of any laws of Congress, to make a money contribution in connection with any election to any political office. It shall also be unlawful for any corporation whatever to make a money contribution in connection with any election at which Presidential and Vice-Presidential electors or a Representative in Congress is to be voted for or any election by any State legislature of a United States Senator. . . ." 34 Stat. 864.

(Annual Message of President Theodore Roosevelt). Respondent bases his derivative action on the second purpose, claiming that the intent to protect stockholders from use of their invested funds for political purposes demonstrates that the statute set up a federal right in shareholders not to have corporate funds used for this purpose.

However, the legislative history of the 1907 Act, recited at length in *United States* v. *Auto Workers,* 352 U. S. 567 (1957), demonstrates that the protection of ordinary stockholders was at best a secondary concern.[13] Rather, the primary purpose of the 1907 Act, and of the 1925 Federal Corrupt Practices Act, 43 Stat. 1070, which

---

[13] Section 610 was later expanded to include labor unions within its prohibition. The history of this expansion has been recounted before. *United States* v. *CIO,* 335 U. S. 106, 114–116 (1948); *United States* v. *Auto Workers,* 352 U. S. 567, 578–584 (1957); *Pipefitters* v. *United States,* 407 U. S. 385, 402–409 (1972). We note that Congress did show concern, in permanently expanding § 610 to unions, for protecting union members from use of their funds for political purposes. See *United States* v. *CIO, supra,* at 135, 142 (Rutledge, J., concurring). This difference in emphasis may reflect a recognition that, while a stockholder acquires his stock voluntarily and is free to dispose of it, union membership and the payment of union dues is often involuntary because of union security and check-off provisions. Cf. *Machinists* v. *Street,* 367 U. S. 740 (1961). It is therefore arguable that the federal interest in the relationship between members and their unions is much greater than the parallel interest in the relationship between stockholders and state-created corporations. In fact, the permanent expansion of § 610 to include labor unions was part of comprehensive labor legislation, the Taft-Hartley Act of 1947, while the 1907 Act dealt with corporations only with regard to their impact on federal elections. We intimate no view whether our conclusion that § 610 did not give rise directly to a cause of action for damages in favor of stockholders in state-created corporations necessarily would imply that union members, despite the much stronger federal interest in unions, are also relegated to state remedies.

re-enacted the 1907 provision with some changes as § 313 of that Act, see *United States* v. *Auto Workers, supra,* at 577, was to assure that federal elections are " 'free from the power of money,' " 352 U. S., at 574, to eliminate " 'the apparent hold on political parties which business interests . . . seek and sometimes obtain by reason of liberal campaign contributions.' " *Id.,* at 576, quoting 65 Cong. Rec. 9507 (1924) (remarks of Sen. Robinson). See also 352 U. S., at 571–577. Thus, the legislation was primarily concerned with corporations as a source of aggregated wealth and therefore of possible corrupting influence, and not directly with the internal relations between the corporations and their stockholders. In contrast, in those situations in which we have inferred a federal private cause of action not expressly provided, there has generally been a clearly articulated federal right in the plaintiff, *e. g., Bivens* v. *Six Unknown Federal Narcotics Agents, supra,* or a pervasive legislative scheme governing the relationship between the plaintiff class and the defendant class in a particular regard, *e. g., J. I. Case Co.* v. *Borak, supra.*

*Second,* there is no indication whatever in the legislative history of § 610 which suggests a congressional intention to vest in corporate shareholders a federal right to damages for violation of § 610. True, in situations in which it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to *create* a private cause of action, although an explicit purpose to *deny* such cause of action would be controlling.[14] But where, as here, it is at least dubious

---

[14] Petitioners point out that the Federal Election Campaign Act of 1971 did create a private complaint procedure with regard to the disclosure provisions there enacted, § 308 (d), 86 Stat. 18, and yet, while the Act, § 205, did amend § 610, it did not provide a parallel remedy for private parties for violations of § 610. Relying on *Amtrak,* 414 U. S. 453 (1974), and *T. I. M. E., Inc.* v. *United*

whether Congress intended to vest in the plaintiff class rights broader than those provided by state regulation of corporations, the fact that there is no suggestion at all that § 610 may give rise to a suit for damages or, indeed, to any civil cause of action, reinforces the conclusion that the expectation, if any, was that the relation-

*States,* 359 U. S. 464 (1959), they ask us to infer from the fact that some private remedy was provided with regard to Title III of the 1971 Act an intention to deny any such remedy with regard to the criminal statutes amended in Title II.

We find this excursion into extrapolation of legislative intent entirely unilluminating. In *Amtrak,* there was a private cause of action provided in favor of certain plaintiffs concerning the particular provision at issue. It was in this context that we referred to "[a] frequently stated principle of statutory construction . . . that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." 414 U. S., at 458. In addition, there was specific support in the legislative history of the Amtrak Act for the proposition that the statutory remedies were to be exclusive. *Id.,* at 458–461.

In *T. I. M. E., supra,* the Court did rely in part upon the fact that a particular remedy was provided with regard to certain parts of the Interstate Commerce Act to infer that none was intended with regard to others. But again, there was specific support in the legislative history for this inference. 359 U. S., at 471–472, 477, and n. 18.

Here, there was, as far as the parties have been able to point out and as far as we have been able independently to determine, no discussion whatever in Congress concerning private enforcement of § 610. Further, while § 610 was amended in ways not pertinent here in 1971, it was, as we have seen, of much earlier origin, and it would be odd to infer from Congress' actions concerning the newly created provisions of Title III any intention regarding the enforcement of a long-existing statute.

Petitioners also suggest that the legislative history of the Amendments throw a "cross-light," *Pipefitters* v. *United States,* 407 U. S., at 427, upon Congress' understanding concerning private enforcement of § 610. Any such light cast is, in our view, exceedingly dim and of little help here.

ship between corporations and their stockholders would continue to be entrusted entirely to state law.

*Third,* while "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose," *J. I. Case Co. v. Borak,* 377 U. S., at 433, in this instance the remedy sought would not aid the primary congressional goal. Recovery of derivative damages by the corporation for violation of § 610 would not cure the influence which the use of corporate funds in the first instance may have had on a federal election. Rather, such a remedy would only permit directors in effect to "borrow" corporate funds for a time; the later compelled repayment might well not deter the initial violation, and would certainly not decrease the impact of the use of such funds upon an election already past.

*Fourth,* and finally, for reasons already intimated, it is entirely appropriate in this instance to relegate respondent and others in his situation to whatever remedy is created by state law. In addition to the *ultra vires* action pressed here, see n. 6, *supra,* the use of corporate funds in violation of federal law may, under the law of some States, give rise to a cause of action for breach of fiduciary duty. See, *e. g., Miller v. American Telephone & Telegraph Co.,* 507 F. 2d 759 (CA3 1974). Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law expressly requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation. If, for example, state law permits corporations to use corporate funds as contributions in state elections, see *Miller, supra,* at 763 n. 4, shareholders are on notice that their funds may be so used and have no recourse under any federal statute. We are

necessarily reluctant to imply a federal right to recover funds used in violation of a federal statute where the laws governing the corporation may put a shareholder on notice that there may be no such recovery.

In *Borak, supra,* we said: "[If] the law of the State happened to attach no responsibility to the use of misleading proxy statements, the whole purpose of [§ 14 (a) of the Securities Exchange Act of 1934] might be frustrated." 377 U. S., at 434–435. Here, committing respondent to state-provided remedies would have no such effect. In *Borak,* the statute involved was clearly an intrusion of federal law into the internal affairs of corporations; to the extent that state law differed or impeded suit, the congressional intent could be compromised in state-created causes of action. In this case, Congress was concerned, not with regulating corporations as such, but with dulling their impact upon federal elections. As we have seen, the existence or nonexistence of a derivative cause of action for damages would not aid or hinder this primary goal.

Because injunctive relief is not presently available in light of the Amendments, and because implication of a federal right of damages on behalf of a corporation under § 610 would intrude into an area traditionally committed to state law without aiding the main purpose of § 610, we reverse.

*It is so ordered.*