M. R. MIKKILINENI, d/b/a M. R. Mikkilineni Co., Engineers

v.

UNITED ENGINEERS & CONSTRUCTORS, INC., Deleuw, Cather/Parsons and the Federal Railroad Administrator.

Civ. A. No. 78-2790.

United States District Court, E. D. Pennsylvania.

March 4, 1980.

---

Ronald B. Merriweather, Philadelphia, Pa., Kenneth Weinstein, Dept. of Transportation, Washington, D. C., Robert S. Forster, Jr., Asst. U. S. Atty., Philadelphia, Pa., for defendants.

John S. Hibschman, Thomas F. Hafer, Fry, Hibschman, & Golden, Reading, Pa., for plaintiffs.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

To upgrade intercity railroad passenger service, Congress authorized defendant Federal Railroad Administrator (FRA) to administer the Northeast Corridor Improvement Program (NECIP) under the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. § 801 et seq. (Railroad Act). Implementing this act, the FRA entered into two major contractual agreements, one with the National Railroad Passenger Corporation, the other with defendant DeLeuw, Cather/Parsons (DCP) as a joint venture. Fulfilling its contractual ob-ligations to the FRA, DCP was required to employ numerous prime and subcontractors, whose contracts with DCP had to include a goal of fifteen per cent minority business participation. Contractor selection involved consideration of a variety of factors, including whether the proposed contractor was minority[1] owned and whether it employed minority subcontractors. Firms which met either of these qualifications received "points" during the contract selection process. The firm awarded the most points negotiated the final contract with DCP.

Early in 1978, plaintiff, an "Asian-American from the Indian sub-continent", apparently qualified as a minority contractor. About the same time, DCP announced that it wished to receive bids from proposed general contractors for the design of power supply facilities and catenary systems, later known as "Project ZEQ", between Wilmington, Delaware, and Trenton, New Jersey. Plaintiff, doing business as M. R. Mikkilineni Company, Engineers, submitted bids for both the prime contract and, alternatively, a subcontract with another aspiring general contractor, defendant United Engineers and Constructors (U.E. & C.), whose presentation to the Contract Evaluation Board, the body authorized to award the contract, listed plaintiff as a prospective subcontractor. DCP awarded U.E. & C. the prime contract in April 1978 with instructions to submit a detailed contract estimate in order to open negotiations. Shortly thereafter, U.E. & C. and plaintiff entered into negotiations concerning both the price and scope of work which plaintiff would undertake.

During contract negotiations plaintiff sought from U.E. & C. information regarding the historic split between civil/structural and electrical portions of work on other substations. U.E. & C. refused to grant plaintiff access to this information.[2] When

1. "Minority" is defined as "women, Blacks, Hispanic Americans, American Indians, American Eskimos, American Orientals and American Aleuts". 49 C.F.R. § 265.5(i).

2. U.E. & C. wrote to plaintiff that the request "alarms us" as U.E. & C. "had been lead to believe that your firm was competent to do such work by reason of the past experience of individuals in your organization . . ." The letter further ventured "if you are competent to do this work, you must be competent to assess the effort required". See letter of J. H. Fullerton, Vice-President and Manager of U.E. & Co.'s General Engineering Division, to M. R. Mikkilineni, June 30, 1978.

plaintiff requested this information from DCP, they, too, refused.[3] Contract negotiations between plaintiff and U.E. & C. floundered until August 1978, when they were terminated by U.E. & C.

Plaintiff then filed a *pro se* complaint naming U.E. & C., DCP and the FRA as defendants.[4] Six months later, plaintiff, now represented by counsel, filed against the same three defendants an amended complaint which sought damages and equitable relief for alleged violations of the Brooks Act, 40 U.S.C. § 541 *et seq.*, Sherman Act, 15 U.S.C. § 1, § 2, Civil Rights Act of 1866, 42 U.S.C. § 1981, Civil Rights Act of 1871, 42 U.S.C. § 1985(3), Railroad Revitalization and Regulatory Reform Act, 45 U.S.C. § 803(a) (which prohibits discrimination by recipients of federal funds) and regulations promulgated thereunder, review of agency action pursuant to the Administrative Procedure Act, 5 U.S.C. § 702, and breach of contract.[5]

Plaintiff attacks the method employed in selecting U.E. & C. as the prime contractor. More specifically, plaintiff contends the criteria violate the Brooks Act, which requires the Federal Government to "negotiate contracts for architectural and engineering services on the basis of *demonstrated competence and qualification* for the type of professional services required". 40 U.S.C. § 542 (emphasis added). Factors which the Contract Evaluation Board analyzed in making its determination included "institutional maturity, organizational framework, management plans and approach, manage-

ment group experience, availability of disciplines". Plaintiff complains that these criteria unduly stress those factors most likely to yield selection of a large, established firm rather than a small minority one with *individual* rather than *institutional* competence and qualifications.[6]

Defendants contend that federal regulations allow consideration of those factors which plaintiff attacks. Specifically, defendants point to Brooks Act regulations stating that

[i]n evaluating architect-engineer firms the architect-engineer evaluation board shall apply the following criteria, other criteria established by agency regulation, and any criteria set forth in the public notice on a particular contract:

(a) *Specialized experience and technical competence of the firm* (including a joint venture or association) with the type of service required;

(b) *Capacity of the firm* to perform the work (including any specialized services) within the time limitations;

(c) *Past record of performance* on contracts with Government agencies and private industry with respect to such factors as control of costs, quality of work, and ability to meet schedules.

41 C.F.R. § 1–4.1001–3 (emphasis added).

■ Neither the facts nor the law support plaintiff's position that the contractor selection process contravenes the Brooks Act, which requires negotiations on the basis of "demonstrated competence". This

---

3. DCP states that the denial was based on two primary considerations. One, the information sought was proprietary in nature and absent express authority it could not be disclosed. Two, due to the number and variety of individual sites the figures were not comparable.

4. In response to plaintiff's *pro se* complaint defendants DCP and FRA filed Motions to Dismiss, or in the alternative, Motion for a More Specific Statement. Defendant U.E. & C. filed a Motion for Summary Judgment.

5. In response to plaintiff's amended complaint, FRA filed a Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted, while DCP moved for Summary judgment.

U.E. & C. has neither renewed its previous Motion for Summary Judgment nor filed any other such motion.

6. Of the thirty criteria used by DCP in selecting a firm, plaintiff objects to only five; those which are presumably unobjectionable are the sub-categories: "Owned, Joint Venture, Consultants; Specific Project Participation; Affirmative Action Status; Affirmative Action Projection; Other" all of which fall into the major heading of "minority participation".

The sub-category "Key Personnel Qualifications" under the major heading of "Firm Capabilities" is also apparently unobjectionable to plaintiff.

demonstration of competence can either be of an individual or institutional nature. DCP's selection criteria consider both.[7] Plaintiff's position is further eroded by the undisputed fact that minority architect/engineering firms perform 27% of the work, or 29.23% of the total negotiated value on the entire NECIP.

Plaintiff's profuse allegations breed many other issues, whether plaintiff, a United States citizen from the Indian subcontinent, is a "minority" within the meaning of 49 C.F.R. § 265.5(i),[8] whether U.E. & C., DCP and FRA discriminated against him due to his alleged minority status and whether the failure of defendants to provide plaintiff with certain information during contract negotiations violated affirmative action requirements provided by 49 C.F.R. § 265.13.

Before addressing the issues outlined above our attention is directed to the threshold inquiry of whether a private right of action under the Railroad Act and regulations promulgated thereunder exists on behalf of plaintiff. Moving for summary judgment, defendant DCP denied any racial/national origin discriminatory intent in its dealings with plaintiff and further asserts that since the Railroad Act does not expressly provide for a private right of action, this Court should refuse to imply one, pointing out, however, that if a private right of action is implied, the doctrine of exhaustion of administrative remedies requires remanding the case for administrative proceedings.

A four-part balancing test generally answers whether a private cause of action should be implied. That test, announced in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), requires consideration of these questions:

> is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" —that is, does the statute create a federal right in favor of the plaintiff? Second,

is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? (citations omitted)

*See also National Sea Clammers Association v. City of New York*, 616 F.2d 1222 (3d Cir. 1980) and *Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641 (3d Cir. 1980) (Aldisert, J., dissenting). *Cf. Transamerica Mortgage Advisors, Inc. v. Lewis*, —— U.S. ——, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Applying this test, the Supreme Court recently held in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), that a statutory scheme, which defendant DCP admits is "remarkably similar" to the one at bar, did provide for a private right of action. The *Cannon* court considered whether a private right of action could be implied under 20 U.S.C. § 1681, *et seq.* (Title IX). Importantly, the prohibition against sexual discrimination in education is *virtually identical* to the prohibition against racial and other discrimination proscribed by the Railroad Act.

The first strand of the *Cort* analysis requires consideration of whether the plaintiff is "one of the class for whose *especial* benefit the statute was enacted". Writing for the *Cannon* majority, Mr. Justice Stevens found that Congress drafted Title IX with the "unmistakable focus on a benefited class" rather than "a ban on discriminatory conduct by recipients of federal funds or . . . a prohibition against disbursement of public funds to educational institutions engaged in discriminatory practices."

---

**7.** See note 6 *supra*.

**8.** Defendant DCP in their "Statement of Material Facts as to Which No Genuine Issue Exists" admits in paragraph 18 that plaintiff qualified as a "minority" contractor in early 1978. However, in their Motion for Summary Judgment they assert that plaintiff's allegations are insufficient to bring him within the definition of a "minority" under 49 C.F.R. § 265.5(i).

*Cannon v. University of Chicago*, at 691–693, 99 S.Ct. at 1955. The Court hinted that a private right of action will be implied under those statutes which, by their language, "expressly identif[y] the class Congress intended to benefit". *Id.* at 690, 99 S.Ct. at 1954. In fact, "[w]ith the exception of one case, in which the relevant statute reflected a special policy against judicial interference, this Court has never refused to imply a cause of action where the language of the statute explicitly conferred a right directly upon a class of persons that included the plaintiff in the case". *Id.* at 690, n. 13, 99 S.Ct. at 1954.[9]

For the purposes of our *Cort* analysis only, we assume *arguendo* that plaintiff falls within the class sought to be benefitted by § 803(a) as further defined by 49 CFR § 265.5(i). Whether plaintiff is, *in fact*, within the class sought to be benefitted involves interpretation of an agency regulation, the scope of which is more properly defined by the agency statutorily charged with its enforcement. Since the gravamen of plaintiff's complaint is the alleged violation of 49 C.F.R. § 265 *et seq.*, it would be particularly helpful in resolving these issues to have the agency construe its own statute free from any present instruction and prior to an adjudication by this Court. *Drennon v. Philadelphia General Hospital*, 428 F.Supp. 809, 818 (E.D.Pa. 1977). Our ultimate disposition of the case reflects this concern.

The second *Cort* factor requires determining whether any explicit or implicit Congressional intent to create a private right of action is discernible. Although Congress provided no clear guidance it need not "show an intention to *create* a private cause of action, although an explicit purpose to *deny* such a cause of action would be controlling". *Cort v. Ash*, 422 U.S. at 82, 95 S.Ct. at 2090. The mere fact that legislative history is silent as to a specific section "does not negate the existence of a private cause of action under the statute". *Drennon v. Pennsylvania General Hospital*, 428 F.Supp. at 815. Where a plaintiff is a member of the benefitted class, where Congress has not expressly denied a private cause of action, and where the language of the statute explicitly confers a right directly upon a class of persons that may include the plaintiff, we conclude that the second strand of the *Cort* test is satisfied.

Application of the third part of the *Cort* test, whether it is "consistent with the underlying purposes of the legislative scheme to imply such remedy for the plaintiff", directs attention to the officially declared "policy" articulated in § 801(b) of the Railroad Act, which does not explicitly provide for minority participation in the revitalization of the nation's railroad system. However, the very next substantive subsection, § 803(a), contains the non-discrimination provision of the Act which plaintiff seeks to invoke. Implementing subsection 803(a), subsection 803(b) grants the Secretary of the Department of Transportation broad authority to force compliance. The specific procedures which the Secretary must follow in seeking compliance are found at 49

---

**9.** The requirement that plaintiff be in the class sought to be benefitted was again highlighted in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 62 (1979), where the Court refused to imply a private right of action under the Securities Exchange Act of 1934, 15 U.S.C. § 78q(a), as that section "grants no private rights to any identifiable class". *Id.* at 576, 99 S.Ct. at 2489. Rather, that section "simply require[s] certain regulated businesses to keep records and file periodic reports to enable relevant governmental authorities to perform their regulatory functions". *Id.* at 569, 99 S.Ct. at 2486.

Recently the Third Circuit in *United States v. Ohio Barge Lines*, 607 F.2d 624 (3d Cir. 1979) refused to imply an *in personam* right on behalf of the government under the Safe Rivers and Harbors Act of 1899, 33 U.S.C. § 403, even though the government is a principal beneficiary under the Act. Apparently, this singular conclusion, satisfying the first stand of the *Cort* test, is insufficient, by itself, to imply a private cause of action where doing so is not "clearly consistent with the underlying purposes of the Act". *Id.* at 631.

Hence to have implied a private right of action in *Ohio Barge* would have done violence to the third strand of the *Cort* test. Although the Supreme Court has never decided that the four *Cort* factors are entitled to equal weight, "the first three factors . . . are ones traditionally relied upon". *Touche Ross & Co. v. Redington*, 442 U.S. at 575–76, 99 S.Ct. at 2489.

C.F.R. § 265 *et seq.* and were promulgated pursuant to § 803(d).

Finally, the history of federal involvement in securing civil rights makes it quite clear that this area is not one "traditionally relegated to State law", the fourth strand of the *Cort* analysis. Furthermore, the federal government's interest in preventing employment discrimination on the basis of race in federally assisted programs and activities scarcely requires comment. *See Drennon v. Philadelphia General Hospital*, 428 F.Supp. at 815. Undoubtedly, involvement in interstate transportation and services through the use of railroads has long been a matter of federal involvement and not "relegated to State laws". *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2087.

■ We, therefore, hold that the Railroad Revitalization and Regulatory Reform Act of 1976 *does* imply a private cause of action in favor of plaintiff. However, in light of the related doctrines of primary jurisdiction and exhaustion of administrative remedies, we do not reach the merits of plaintiff's claims. Plaintiff complains that available administrative remedies are "essentially limited to investigations initiated by the federal monitoring machinery at its pleasure" and, therefore, exhaustion of and compliance with them is unnecessary. *Rosado v. Wyman*, 397 U.S. 397, 406, 90 S.Ct. 1207, 1215, 25 L.Ed.2d 442 (1970). We disagree.

Administrative proceedings provided by pertinent federal regulations seek to "resolve disputes by informal means whenever possible". 49 C.F.R. § 265.21(d)(1). Informal proceedings are triggered by complaints which the Administrator "will"[10] investigate in order to determine whether there has been a violation of the affirmative action program. When a violation is found to exist, the Administrator "shall"[11] inform the party of the alleged non-compliance. Where informal means fail to yield compliance "action *will* be taken pursuant to section 265.23".[12] That section, entitled "Procedures for Effecting Compliance" grants the Administrator an impressive array of tools,[13] the very existence of which provide deterrent value. Both the informal administrative proceeding[14] and the more formal one[15] are mandatory and quite clearly *not* initiated by the Administrator at his pleasure. Accordingly, plaintiff's reliance on 49 C.F.R. § 265.21(b) is misplaced. Providing that

[a]ny person who believes himself or herself or any other person to be subject to discrimination prohibited by this part *may* file with the Administrator a written complaint,

this section clearly cannot allow one who witnesses, or has knowledge of, discrimination against "any person" to file suit in district court since that private third person to the illegal discrimination would lack the requisite standing required by Article III of the Constitution. Standing requires a "personal stake in the outcome of the controversy to insure concrete adverseness", *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 71, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978), and a "distinct and palpable injury to himself". *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

Furthermore, other considerations also militate against plaintiff's interpretation. Ordinarily, informal resolution of disputes and voluntary compliance with administra-

10. 49 C.F.R. § 265.21(c).

11. 49 C.F.R. § 265.21(d)(1).

12. *Id.* [emphasis added].

13. The Administrator can order that financial assistance be suspended in whole or in part while a final decision as to noncompliance with the affirmative action provisions of the regulation is made. Where the Administrator determines that compliance can reasonably be obtained but curative action is not forthcoming, he may direct that no further financial assistance be provided, or refer the matter to the Attorney General, or exercise the powers provided by Title VI of the Civil Rights Act of 1964, or take such other actions as may be provided by law.

14. 49 C.F.R. § 265.21(d)(1).

15. 49 C.F.R. § 265.23(a).

tive regulations is preferred, especially where a regulatory mechanism has been established for the specific purpose of mediation and conciliation of disputes. *Cf. Vaca v. Sipes*, 386 U.S. 171, 184, 87 S.Ct. 903, 913, 17 L.Ed.2d 842 (1967) (exhaustion of internal union remedies is a prerequisite to filing suit), *Glus v. C. G. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977) (the goal of conciliation without resort to already overburdened federal courts is of great importance and should not be lost), *Martin v. Easton Publishing Co.*, 478 F.Supp. 796, 797 (E.D.Pa. 1979) (exhaustion of EEOC procedures is a prerequisite to filing suit).

Finally, the very wording of 49 C.F.R. § 265.21(d) specifically *requires* that questions concerning compliance "shall be resolved by informal means whenever possible". Even after an initial determination of noncompliance has been made pursuant to 49 C.F.R. § 265.21, the person against whom such a finding has been made has the "*right* . . . to request an informal hearing". 49 C.F.R. § 265.23 (emphasis added). As such, the administrative proceeding vests rights in both the victim of the alleged discrimination and the perpetrator. Both have the "right" to request an informal hearing. Consequently, an attempt to invoke this Court's jurisdiction prior to pursuing and exhausting available administrative remedies violates this clearly worded regulatory scheme and defendant's rights thereunder.

Other legal concepts sounding in judicial self-restraint support our position. Exhaustion is "constitutionally . . . grounded in a concept of judicial self-restraint". *Babcock & Wilcox Co. v. Marshall*, 610 F.2d 1128, 1137 (3d Cir. 1979). *Cf. Fort Summer Tours, Inc. v. Andrus*, 564 F.2d 1119, 1123 (4th Cir. 1977) (ripeness) ("[g]enerally . . judicial review awaits the issuance of a formal administrative order enforceable against a person or class of persons"). However, the judicially created doctrine of exhaustion admits of some exceptions,

> when resort to administrative remedies would be futile, when agency involvement 'clearly and unambiguously violates

statutory or constitutional rights' or 'if the prescribed administrative procedure is clearly shown to be inadequate to prevent irreparable injury.'

*Babcock & Wilcox Co. v. Marshall*, 610 F.2d at 1138 (footnotes omitted), or when "clear legislative instruction exists". *Armstrong v. Kline*, 476 F.Supp. 583, 602 (E.D.Pa.1979).

None of the judicial exceptions recently reaffirmed in *Babcock & Wilcox* are present here. Clearly, plaintiff *knew* of the administrative proceeding when he filed the amended complaint. Only three weeks prior thereto, plaintiff wrote to the Chief Counsel of the Federal Railroad Administration and sought to obtain information regarding the method by which he could file against the FRA "an administrative complaint" which he "intend[ed] to file". Plaintiff then requested that the FRA mail him "appropriate forms Etc. including instructions to file this complaint". The FRA, responding, stated that "there are no standard forms which must be used for commencement of an administrative action against the FRA". They did, however, suggest that plaintiff include in his complaint a list of specific facts and told him to whom to mail the complaint. They also photocopied 49 C.F.R. § 265.21 for plaintiff's convenience and suggested that he "read the entire regulation".[16] The FRA was, at that time, *aiding* plaintiff in pursuing his claim; such conduct is exactly what is expected under a regulatory scheme designed to promote informal conciliation of disputes rather than litigation. As such, it cannot be said that pursuit of administrative remedies would have been futile or fit into any of the other judicially created exceptions. *Babcock & Wilcox Co. v. Marshall*, 610 F.2d at 1138.

Plaintiff's by-pass of the administrative procedures would frustrate the goals of "prevent[ing] . . . courts . . . from entangling themselves in abstract disagreements over administrative policies, and . . . protect[ing] the agencies from judicial interference until an administrative decision has been formalized", *Abbott Laboratories v. Gardner*, 387 U.S. 136,

---

**16.** See FRA's Motion to Dismiss, Exhibit 2.

148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), and promoting "the most efficient use of judicial resources". *Babcock & Wilcox Co. v. Marshall*, 610 F.2d at 1137.

The requirement that plaintiff exhaust administrative remedies "affects only the timing, and not the effectiveness of judicial review". *Barnes v. Chatterton*, 515 F.2d 916, 921 (3d Cir. 1975). *See* 45 U.S.C. § 803(e).

Equally compelling in our decision to remand is the doctrine of primary jurisdiction. That doctrine seeks to

avoid conflict between the courts and an administrative agency arising from either the court's lack of expertise with the subject matter of the agency's regulation or from contradictory rulings by the agency and the court . . . A court should refer a matter to an administrative agency for resolution, even if the matter is otherwise properly before the court, if it appears that the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's particular field of expertise.

*MCI Communications Corp. v. American Telephone and Telegraph Co.*, 496 F.2d 214, 220 (3d Cir. 1974). Even where the facts *are* within the court's "ordinary competence" the court's limited functions are more rationally exercised "by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure". *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). The procedures available to plaintiff at the administrative level are those which the court in *Far East* stressed in its dismissal. *See* 49 C.F.R. § 265.21, 23.

An appropriate order will follow.

1. Although 49 C.F.R. § 265.21(b) requires that the complaint "must be filed not later than sixty (60) days after the date complainant discovers the alleged discrimination" plaintiff is hereby granted leave to file a complaint at the administrative level for proceedings provided by 49 C.F.R. § 265.21, 23. Holding the remain-

ORDER

AND NOW, this 4th day of March, 1980, IT IS ORDERED that the complaint is DISMISSED without prejudice.[1]

der of plaintiff's claims in abeyance would serve no purpose under these circumstances, *Far East Conference v. United States*, 342 U.S. at 577, 72 S.Ct. at 495. Hence, plaintiff's entire complaint is dismissed "without prejudice". We express no opinion as to the validity of these claims.