**CITY OF PHILADELPHIA**

**v.**

**COMMONWEALTH OF PENNSYLVANIA et al.**

**Civ. A. No. 79–3833.**

United States District Court,
E. D. Pennsylvania.

Feb. 9, 1981.

Louis F. Hinman, Asst. City Sol., City of Philadelphia, Philadelphia, Pa., for plaintiff.

Stanley I. Slipakoff, Deputy Atty. Gen., Commonwealth of Pa., Philadelphia, Pa., for Com. of Pa.

Ellen J. Sazzman, Dept. of Justice, Washington, D. C., for federal defendant.

## MEMORANDUM

CLIFFORD SCOTT GREEN, District Judge.

This litigation is the result of a dispute concerning the alleged failure of the Commonwealth of Pennsylvania to reimburse the City of Philadelphia for expenses incurred by the latter in providing child welfare services. Seeking declaratory and injunctive relief as well as damages, plaintiff City has sued the Commonwealth defendants[1] and the federal defendant, Patricia Roberts Harris, Secretary of Health and Human Services for purported violations of Title IV–B (42 U.S.C. §§ 620–626) and Title XX (42 U.S.C. §§ 1397–1397f) of the Social Security Act and the Commonwealth defendants alone for alleged breach of contract. Stating that the action arises under the constitution and laws of the United States and the amount in controversy exceeds $10,000, plaintiff alleges jurisdiction under 28 U.S.C. §§ 1331, 1361 and 2201. Although the plaintiff fails to mention it in its statement of jurisdiction, it is clear that the complaint also requests the Court to exercise pendent jurisdiction over the contract claim.

The matter is now before the Court on motions to dismiss, filed pursuant to Fed.R. Civ.P. 12(b) by all the defendants.[2] For reasons set forth in the following discussion, I will grant these motions and dismiss the complaint.

The Pennsylvania Department of Public Welfare (DPW) entered into a Child Welfare Service Agreement with the City of Philadelphia.[3] (Exhibit "A" to the complaint) Pursuant to this contract, the City agreed to provide protective and foster care services to children found eligible by the county board of assistance while DPW agreed to provide technical consultation and assistance to the City, review periodically the City's delivery of these services and reimburse it for seventy-five percent of the money spent in carrying out the program. The agreement specifically states that the City is to submit a monthly bill to DPW for the preceding month's expenditures.[4]

According to the complaint, Title IV–B of the Social Security Act was the ultimate source of funds for this program. Thus, the

---

1. Defendants named in the complaint include: the Commonwealth of Pennsylvania, Richard L. Thornburg, Governor of Pennsylvania; Helen B. O'Bannon, Secretary of the Pennsylvania Department of Public Welfare; and Robert E. Casey, Treasurer of Pennsylvania. I shall refer to these defendants collectively as the Commonwealth defendants.

2. The federal defendant has also moved alternatively for summary judgment.

3. Actually, the agreement refers to the county; however, in the case of Philadelphia the county is synonymous with the City.

4. Paragraph eleven of the Child Welfare Service Agreement states:

    The Department will pay the County monthly for the services provided to eligible children in the preceding month. The amount of the Department's payment to the County shall be determined from invoices submitted by the 10th of the month following the month in which the service is provided and shall be at the rate of 75% of the County's net expenditure for services to eligible children.

money used by DPW to reimburse the City came from monies given the Commonwealth by the federal government. Plaintiff contends that this Child Welfare Agreement continued in effect until October 1, 1975 when the newly enacted Title XX of the Social Security Act became effective. Title XX, according to the complaint, placed a ceiling on the amount of federal money available to the States to pay for such programs as child welfare services.[5] Plaintiff alleges that in order to ease the transition to the new program, Title XX requires that each State receiving federal funds under Title XX must establish and publish a plan, known as a comprehensive annual services program plan, showing how it intends to use the money.

At issue in this lawsuit is money supposedly owed the City by DPW for child welfare services provided by the City pursuant to the 1972 Agreement and to the Title IV–B program. The complaint states that on October 17, 1975, the City submitted an invoice prepared in September of 1975 (hereinafter the September, 1975 invoice) requesting reimbursement in the amount of $4,404,174.42 for expenditures made by the City in providing child welfare services before September, 1975 and under Title IV–B. Some of these expenditures were for services provided as early as September, 1973. Plaintiff alleges that DPW told the City that it would not reimburse the City for most of the expenses covered by the September, 1975 invoice because the Department had reached its funding limit under Title XX for the fiscal year, 1975–76.[6]

The complaint alleges that Pennsylvania DPW violated Title IV, Title XX and applicable Health and Human Services regulations by including the request for reim-

bursements made in the September, 1975 invoice as part of the expenditures for the fiscal year 1975–76, governed by the restricted funding of Title XX, since those disbursements were made by the City in earlier years when child welfare services were provided under Title IV–B. Plaintiff further contends that DPW's treatment of the September, 1975 invoice as part of the 1975–76 fiscal year Title XX expenditures violated the terms of the Child Welfare Service Agreement and the parties' prior course of dealing whereby DPW would reimburse the City for expenses already incurred. The complaint also charges defendant DPW with failure to give the City adequate notice of the new policy of applying Title XX funding limitations to expenditures made by City before the effective date of Title XX, with failure to prepare an adequate comprehensive annual services program plan as required by Title XX and for failure to distribute its Title IV–B and Title XX funds to geographical regions on an equitable basis.

By way of relief, plaintiff requests, *inter alia*, the Court to order the Commonwealth to pay to the City the $3.7 million allegedly owing on the September, 1975 invoice,[7] and to order the Secretary of Health and Human Services to withhold Title XX funds from Pennsylvania until the Commonwealth begins to administer its Child Welfare Services Program properly and in accordance with the federal statute and regulations.

The principal argument made by the defendants, and the controlling one for purposes of disposing of the motions to dismiss, is that plaintiff cannot sue in federal court under Titles IV and XX of the Social Security Act.[8] The parties do not dispute that

---

**5.** The complaint states that Title XX placed a ceiling on the funds available under Title IV–B. However, the defendants claim that the implementation of Title XX had no effect on Title IV–B but did alter the funding available under Title IV–A. A review of the statutes shows the defendants' contention to be correct.

**6.** Plaintiff states that DPW did give the City $736,182.71 as a partial reimbursement of the

$4,404,174.42 requested by the September, 1975 invoice.

**7.** The City variously describes its request for the $3.7 million as damages and as restitution.

**8.** Although plaintiff also has alleged a cause of action under the due process clause of the Fourteenth Amendment, it is clear that a municipality does not have rights under that amendment.

neither statute expressly authorizes a private cause of action for an alleged injury arising out of a violation of it. Since no express right of action exists, the question becomes whether a cause of action may be implied. Defendants argue that no implied cause of action exists under either statute for a party who stands in the position that the City does in this case. I agree.

In its opinion in *Cort v. Ash*, the Supreme Court identified four factors which should be considered in determining if a cause of action may be implied from a federal statute:

> First, is the plaintiff 'one of the class for whose especial benefit the statute was created' . . . that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the

States, so that it would be inappropriate to infer a cause of action based solely on federal law? 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (citations omitted).

The Court has referred repeatedly to this four point standard in opinions written since the *Cort v. Ash* decision.[9]

An analysis of the instant case reveals that no part of the *Cort v. Ash* test has been satisfied. First, plaintiff City is not a member of the "especial" class for whose benefit Titles IV and XX of the Social Security Act were enacted. Looking to the language of the statutes themselves, as the Supreme Court directs in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979), it is clear that Congress viewed people in need of various welfare services as the primary "beneficiaries" of Titles IV and XX.[10] The only other parties who might be described as intended beneficiaries, given the terms of the statutes, are the States, the recipients of the federal funds allocated by Titles IV and XX for the purpose of helping the States fi-

---

**9.** *See, e. g., Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

**10.** 42 U.S.C. § 601 states that the purpose of IV-A (Aid to Families with Dependent Children) is to encourage "the care of dependent children in their homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in each State, to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Board [Secretary], State plans for aid and services to needy families with children."

42 U.S.C. § 620 states that the purpose of Title IV-B is to "enable the United States, through the Secretary, to cooperate with State public welfare agencies in establishing, extending and strengthening child-welfare services . . ."

The purpose of Title XX is defined in 42 U.S.C. § 1397 as being to encourage

. . . each State, as far as practicable under the conditions in that State, to furnish services directed at the goal of—

(1) Achieving or maintaining economic self-support to prevent, reduce, or eliminate dependency,

(2) achieving or maintaining self-sufficiency, including reduction or prevention of dependency,

(3) preventing or remedying neglect, abuse, or exploitation of children and adults unable to protect their own interests, or preserving, rehabilitating, or reuniting families,

(4) preventing or reducing inappropriate institutional care by providing for community-based care, home-based care, or other forms of less intensive care, or

(5) securing referral or admission for institutional care when other forms of care are not appropriate, or providing services to individuals in institutions.

nance certain welfare services. Plaintiff has failed to point to any language found in Titles IV and XX or to any part of the legislative history of the statutes which would support the view that Congress intended to benefit parties such as the City which, pursuant to contract with a State, provide those welfare services.

■ I turn now to consideration of the second factor, legislative intent to create or to deny such a cause of action. Language found in two of the most recent Supreme Court decisions discussing the issue of implication of a private cause of action suggests that this factor is the most important one.[11] Determining legislative intent regarding the creation of a right of action is a matter of statutory construction, which requires an examination of the language of the statute itself and of the legislative history.

As noted earlier, there is certainly no language in either Title IV or Title XX explicitly creating or denying a right of action on the part of a city who has contracted with the State to provide welfare services. Nor has the plaintiff identified language in the statutes which fairly could be said to create or to deny by implication a cause of action. Similarly, plaintiff has failed to identify any part of the legislative history of these statutes which would support the implication of a cause of action, such as the one presented here, on the part of the City.[12]

·Under *Cort v. Ash*, the third factor to be considered is whether implication of a right of action on the part of plaintiff would be consistent with the underlying purposes of the federal statute in question. Recently the Supreme Court has characterized this consideration as follows:

> . . . a private remedy should not be implied if it would frustrate the underlying purpose of the legislative scheme. On the other hand, when that remedy is necessary or at least helpful to the accomplishment of the statutory purpose, the Court is decidedly receptive to its implication under the statute.

*Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1979).

It is plaintiff's view that a statutory purpose of Titles IV and XX was the creation of what the City calls a "scheme of cooperative federalism." By that term, plaintiff apparently means the statutes in question established a grant system under which cities, as providers of welfare services, as well as the States which are the direct recipients, enjoy certain rights. Plaintiff maintains that it can enforce these rights only if it is given the opportunity to bring an action in federal court.

My assessment of the statutes themselves, their legislative history and the applicable regulations [13] does not accord with that of plaintiff. I have found nothing in these materials to support the view that such a cause of action would be consistent with or necessary to the purposes of these statutes. Indeed, legislative history cited by the federal defendant suggests that such a suit would be inconsistent with at least one of the underlying purposes of Title XX, the granting to the States of considerable discretion in determining the nature of the

11. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 640, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979).

12. The Supreme Court has suggested that in determining whether a cause of action should be implied one can draw a negative inference from a statute's failure either to confer rights on any private parties or to prohibit conduct. *Touche Ross & Co. v. Redington, supra*, 99 S.Ct. at 2486. Although Title IV and Title XX might be said to create certain rights of entitlement in poor people seeking access to the services funded by the programs and in the States for those funds, the statutes primarily are concerned with creating and structuring a system of funding. Certainly, the two statutes do not prohibit conduct.

13. Plaintiff has cited the following federal regulations as relevant: 45 C.F.R. Part 74, 45 C.F.R. Part 201, and 45 C.F.R. Part 220.

welfare services to be provided and the manner of delivery of those services.[14]

Finally, I must consider this case in terms of the last factor identified in *Cort v. Ash*: whether the proposed cause of action is one traditionally relegated to state law and involving an area of primary concern of the States. The complaint alleges that failure to comply with provisions of the Child Welfare Service Agreement executed by plaintiff City and the defendant DPW is at the heart of this dispute. However, in the various memoranda filed in opposition to the motions to dismiss, plaintiff asserts that since its rights emanate not from that contract but from the federal grant legislation, Titles IV and XX, the only proper forum for this dispute is federal court. I do not share this view.

■ Given the allegations of the complaint and the relief sought by plaintiff City, this case appears to involve matters more appropriately the concern of a state court. Any rights the City may have against the Commonwealth defendant for their alleged failure to reimburse the City for its providing of child welfare services during the years 1973 to 1975 arise, if at all, from the Child Welfare Service Agreement and from state law. The City has complained that it was required to provide these services. It is clear, however, that Pennsylvania law, not federal law, mandates that the City provide such services to its citizens.[15] The fact that federal grants ultimately finance a large part of these welfare services or that federal laws and regulations permit a State, as one of its options, to establish a system whereby polit-

ical subdivisions of the State deliver the services funded by the federal grant does not mean that every dispute regarding these welfare services necessarily involves an interpretation of federal law by the federal courts. Indeed, the instant suit as between the Commonwealth and the City raises factual and legal issues governed by state law and should be resolved in state court proceedings.

Plaintiff alleges that under regulations promulgated pursuant to Title XX the federal defendant, the Secretary of the Department of Health and Human Services, has a duty to insure that the Commonwealth reimburse the City for expenditures made by the City for child welfare services prior to the effective date of Title XX. However, I agree with the defense contention that there is nothing in the statute or the regulations requiring the Secretary to oversee the manner in which a state is to reimburse the entities with whom it may have contracted to provide services.

Moreover, although the plaintiff has characterized the purported misconduct of the federal defendant in terms of an ongoing failure to direct properly Pennsylvania's compliance with the Title XX programs, it is apparent that the City's real purpose is to enlist the Secretary's aid in forcing the Commonwealth to reimburse the City for welfare services rendered as far back as 1973. By way of relief, plaintiff requests the Court to order the Secretary to reduce Title XX funds to Pennsylvania *until* the Commonwealth reimburses the City. Therefore, the intent of the city is to make the Secretary its collection agent.[16] While federal regulations invest the Secretary

---

**14.** The federal defendant quotes a portion of the Senate Report (No. 93–1356) on Title XX which supports this contention. (reprinted at [1974] U.S.Code Cong. & Ad.News 8133, 8138.)

**15.** The duties and obligations of the Pennsylvania counties to provide child welfare services are set forth in 62 P.S. §§ 701–708.

**16.** This intent is revealed in paragraphs 68 and 69 of the complaint which state:

68. Since it was the Secretary's failure to oversee the operation of Title XX and its coordination with existing Pennsylvania programs under Title IV–B, it is requested that the Secre-

tary carry out the intent of the Congress and the Health, Education and Welfare guidelines by issuing appropriate sanctions against the Pennsylvania Department of Public Welfare until such time as the City's unreimbursed expenses under Title IV–B are paid.

69. Since the Secretary and her subordinate, the Administrator of Social and Rehabilitation Service have failed to perform their duty under the Social Security Act, and H.E.W. Regulations, the Plaintiff hereby requests that the Secretary of H.E.W. be compelled to perform her duty by initiating a review of funding to the

with the power to reduce or cut off Title XX funds to a State, exercise of that power is discretionary with the Secretary and should be made only as a last resort. As the present claim of the City is founded so clearly on an alleged breach of the agreement with the Commonwealth and not on federal law, it would not be appropriate to imply a cause of action based on Titles IV and XX of the Social Security Act, and thus the case must be dismissed.

This dismissal is consistent with the most recent decisions by the Supreme Court addressing the issue. In those opinions, the Court has shown great reluctance to imply a cause of action. In *Touche Ross & Co. v. Redington*, the Supreme Court wrote:

> To the extent our analysis in today's decision differs from that of the Court in [*J. I. Case Co. v.*] *Borak* [377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423] it suffices to say that in a series of cases since *Borak* we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today. 99 S.Ct. at 2490.[17]

Commonwealth of Pennsylvania and reduce Title XX funds until such time as the City is properly reimbursed for its expenditures obligated before the effective date of Title XX.

**17.** *See also* the very recent opinion of the Third Circuit in *United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980). In that decision,

The plaintiffs Arlene Gicas and Thomas Gicas brought this action pursuant to the the Court of Appeals, affirming the dismissal by the district court, found that the Attorney General for the United States "does not have implied statutory authority to sue a local government or its officials to enjoin violations of citizens constitutional rights." At 199.