Bonnie THOMPSON, Plaintiff,

v.

SPRINGS MILLS, INC., Defendant.

C.A. No. 80–2218–5.

United States District Court,
D. South Carolina,
Rock Hill Division.

Jan. 29, 1982.

---

**ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT**

HEMPHILL, Senior District Judge.

This action was instituted by plaintiff, Bonnie Thompson, pro se,[1] under Section 503 of the Vocational Rehabilitation Act (29 U.S.C. § 793) and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* In her complaint, she alleges, *inter alia,* certain jurisdictional facts and asserts (paragraph 7) that all available administrative remedies were exhausted prior to the institution of this action. The substance of plaintiff's complaint is that she was unlawfully discharged by defendant because of her age and because of a handicap. (Complaint, paragraph 5.)

---

1. In her deposition taken February 12, 1981 at Lancaster, South Carolina, numerous references to which will later be made, plaintiff recited she was represented by Louis L. Lesesne, Jr., Esquire, of Charlotte, North Carolina. Mr. Lesesne, however, by letter to Miller C. Foster, Jr., Clerk of the United States District Court, with a copy to counsel for the defendant, asserts he has not entered an appearance on her behalf and advises that notices, pleadings, etc. should be addressed directly to the plaintiff. The report of the Magistrate suggests a sneaking advising by some lawyer, but the facts are not sufficient to justify a finding, by this Court, as to who actually prepared the pleadings and subsequently, "yellowed out".

Defendant's answer admits plaintiff's age, admits it was a government contractor at the time of plaintiff's discharge, admits the prior existence of an employer-employee relationship with Ms. Thompson, admits the approximate dates of employment but alleges plaintiff quit to take other employment and was not discharged. Defendant denies the remaining allegations of the complaint and raises certain jurisdictional defenses (Answer; Second, Third and Fourth Defenses).

Having completed most of its discovery (final completion is prevented by plaintiff's failure to answer four supplemental Interrogatories served upon her on February 13, 1981) defendant insists that there is no genuine issue of fact with respect to the jurisdictional issues and seeks summary judgment.

Issues involved are: (1) is there private cause of action provided under Section 503 of the Vocational Rehabilitation Act (29 U.S.C. § 793); or, (2) in the alternative, if Section 503 of the Vocational Rehabilitation Act does provide a private cause of action, has plaintiff's failure to exhaust her administrative remedies resulted in a fatal defeat by failing to satisfy conditions precedent to bringing her action; and, (3) as to plaintiff's claim based on Age Discrimination in Employment Act (ADEA), does plaintiff's deposition show that, contrary to the allegations of her complaint, she is not complaining about anything that occurred in February, 1979, but upon which occurred in July, 1978, when allegedly she was refused a transfer and retraining and, as a result, took other employment. Plaintiff failed to file her complaint of age discrimination within one hundred eighty days after those events and, thus, failed to file within the time allowed by law.

After review of the credible testimony and the entire file, this Court reports its

## FINDINGS OF FACT

Plaintiff was employed by defendant at its Lancaster Plant in May, 1976 when she allegedly experienced a fall while leaving work and suffered a back injury. (Plaintiff's answers to defendant's Interrogatory Number 1). The fall was unrelated to her work. She was crossing tracks of the Southern Railroad at the time and later successfully sued that Company for damages.

Following the accident plaintiff consulted several doctors, received various courses of treatment and visited two hospitals and a clinic. She was dissatisfied with matters at work and filed a charge of discrimination against defendant with the South Carolina Department of Labor.[2] In April of 1978 the back problem led to plaintiff being hospitalized for several weeks and, upon her attempted return to work in July, the events which led to this lawsuit apparently occurred. Beginning at page 30, line 15, of plaintiff's deposition[3] she told about her doctor placing her in the hospital, explained defendant's failure to put her back on a job upon her return to work and expressed her feeling that she was being mistreated in July of 1978:

Q. What did he do for your back problem?

A. Put me in the hospital and put me in traction and therapy.

Q. Was that in April of 1978?

A. Yes.

Q. Therapy and traction. How long were you in the hospital?

A. About three or four weeks.

Q. And after that what happened?

A. Well, when I got out he released me to go back to work in July. You're supposed to go back to the medical doctor after you've been out like that, you know, so I carried a doctor's statement that I could return to work but

---

**2.** The 1976 filing is not relevant to the time limits involved herein since South Carolina was not a "deferral state" with respect to the alleged acts of age and handicap discrimination in this case. This fact is relevant, however, to show the long-standing nature of plaintiff's complaints.

**3.** February 12, 1981 at Lancaster, South Carolina.

no lifting and no bending and I went to the medical department with the statement and I gave it to that black headed lady. I can't think of her name but I know her and she gave it to the company doctor.

\* \* \* \* \* \*

(Skipping to page 31, line 18.)[4] ... Anyway, in a little bit they told me they'd sent for my superintendent to come out there.

Q. Who was that?

A. Ted was when I left but they were putting those new looms in at the time and transferring and retraining everybody because they were putting those looms in.

Q. This was June of 1978?

A. July of 1978. They sent Jimmy Ghent out there. They had him on one end. They were still taking the looms out but Ted was on the end where they'd done put some new looms in. Now, this is what got me. They retrained or transferred everybody in my department and refused me a transfer.

Plaintiff thus clearly related the alleged discrimination to the July 1978 incident when her department was undergoing extensive changes and, allegedly, she was refused retraining and transfer. She testified she appealed to the plant personnel manager at that time, to no avail. The following appears in plaintiff's deposition beginning at page 33, line 10:[5]

Q. Was it your understanding that you were terminated at that time?

A. When I went down there with that doctor's statement in July, whenever Jimmy [Ghent] came out there he told me they didn't have nothing I could do out there. Okay. They told me to go to the personnel manager. He told me ... I asked for all kind of jobs on other training programs and he told me the onlyest way I could come off the job

was to quit because they didn't have nothing I could do. He told me he'd let me stay on insurance for a year.

Q. Now, who is this personnel manager?

A. James Fleming.

Q. Jim Fleming told you that?

A. Yes. Said they didn't have a thing I could do because of my back injury.

Q. And this was in July, 1978?

A. And I left out the plant with no way to make a living what...

Q. Excuse me. I want to make sure I've got these times right. That was in July of 1978?

A. 1978.

Plaintiff's perception of the basis of the alleged discrimination which she says she suffered is not clear, as can be seen from her answers to questions about the complaint she had filed with the South Carolina Department of Labor in 1976 and her later problems in 1978. At page 65, line 23,[6] she testified:

Q. Well, Mrs. Thompson, did you feel you were being discriminated against because of your age in 1976?

A. I don't know. I don't know how to put it. I don't know how to put it into words. I knew I had been mistreated.

\* \* \* \* \* \*

And on page 66, at line 8:[7]

Q. In 1978, did you feel that was because of your age or your handicap?

A. Well, he told me on account of my back.

There is no question, however, that her complaint relates to July, 1978, and her feeling she was mistreated then. At page 66, line 11,[8] she responded to a question on the events of July, 1978 by saying if it weren't for what happened in the reorganization of her department there would have been no complaint.

---

**4.** Ibid.

**5.** Ibid.

**6.** Ibid.

**7.** Ibid.

**8.** Ibid.

Q. And were there younger people being put on those retraining jobs or other jobs where people were being transferred in 1978?

A. In 1978, my job was pulled out too. They put new floor down and everything and transferred everyone then and retrained them. If they had just come to me and said, Bonnie, you want to try weaving again, if they had offered me one thing, this wouldn't have happened.

Plaintiff continued to seek re-employment, going back to the plant time and again. She testified at page 66 of her deposition, beginning at line 22 [9] about her inquiries:

Q. After the meeting with Jim Fleming and others in July, 1978, did you have other discussions with Mr. Fleming or Mr. Ackerman concerning transfers?

A. After 1978?

Q. After July, 1978?

A. I went down then two or three times a month.

Q. And you asked them about those same four jobs?

A. I was asking about anything, I'd go to Jimmy. I'd take the doctor's statement and I'd say have they tried to find me anything and he said, "Bonnie, they don't mention you at all." He said, "I don't know what the problem is".

Q. Who said that?

A. Jimmy Ghent.

Plaintiff's inquiries continued until January, 1979, when her last conversation, according to her testimony, was with Jimmy Ghent.

On Page 75, at line 25,[10] the following appears:

Q. Did you see anybody the day before that with your doctor's statement?

A. I saw Jimmy Ghent. I gave Jimmy Ghent the doctor's statement. I got a copy of it too.

Q. That would have been on February the 21st?

A. No. That was in January.

Q. That was the last time you had had a conversation with anybody was back in January?

A. Yes.

Q. That was the last time anybody told you that they didn't have something for you?

A. That was the last time.

Q. And that was the last time that you had tried to get somebody to do something for you.

A. That's right.

This was reinforced on page 91 at line 6: [11]

Q. Did you talk to anybody at the mill in February of 1979?

A. (Indicating No).

Q. Ma'am?

A. No.

Q. So all of these conversations would have had to have been in January of 1979 or earlier?

A. Yes.

Q. You're sure about that?

A. Yes. I didn't talk to nobody but Bonnie that day.

Q. That was the insurance clerk?

A. Yes.

The alleged termination date of February 22, according to plaintiff's testimony, was nothing more than the day she came to the plant on her own initiative to check on her insurance and concluded from her conversation with the insurance clerk that she was terminated. Plaintiff's testimony, beginning at page 73, line 22,[12] tells the story:

Q. How were you informed that your relation with Springs was terminated? Your complaint says that that happened on February 22nd. What happened on February 22nd?

9. Ibid.

10. Ibid.

11. Ibid.

12. Ibid.

A. The only thing I know that happened on February 22nd and you want the truth, right?

Q. Sure.

A. I walked in there and the only person I saw that day was the insurance lady and I asked her about my insurance. I've always been funny about insurance and all the medical coverage I had was at Springs, and I went down there to check on my insurance and I was automatically terminated that day.

Q. You did not see Mr. Fleming that day?

A. None of them. None of them.

Q. You had no conversation with Fleming?

A. None of them.

Q. None with Ackerman?

A. (Indicating No).

Q. Nobody other than the insurance lady?

A. That's it.

Q. Did she give you any papers at that time?

A. Gave me some papers where I could start paying my insurance.

Q. Did you ask to see Mr. Fleming?

A. No.

Q. Did you ask to see anybody?

A. No. I just went to check on my insurance.

The reason plaintiff had remained on defendant's employment roll until February, 1979, is given in the affidavit of J.E. Fleming. Plaintiff was being carried on sick leave and defendant was unaware until January, 1979, that plaintiff had gone to work elsewhere. It was only after investigation of this that plaintiff was dropped as "Quit-to take another job." There is no question, however, that plaintiff wasted no time *in July, 1978*, in getting another job.

Immediately following defendant's alleged failure in July, 1978, to transfer or retain the plaintiff, she sought and obtained employment elsewhere. She first went to work at Holiday Inn. On page 50, line 19,[13] of her deposition she testified:

Q. What date did you start to work with Holiday Inn?

A. I don't know the exact date but it was right after they refused me a job down there because I had to find me something different.

Q. Some time in July?

A. I think it would be.

Q. Of 1978. How long did you work there?

A. I was trying to find me a job closer to home because I was having to drive that far. I believe it was in October or November or something like that.

Q. Of what year?

A. 1978, because I went to work at Eckerd's.

From November 1978, to October 1980, plaintiff worked at Eckerd's Drugs and from that date to April 1981[14] she has been employed at Sky City as a cashier. (Plaintiff's answers to Interrogatories, Numbers 6 and 7).

Plaintiff consulted at least two attorneys about her complaints, Vickie B. Eslinger, Esquire and James Bell, Esquire, in Columbia. On page 92, line 1,[15] of her deposition she testified:

Q. In your letter, you mentioned a couple of lawyers, Vickie Inslinger [sic]. Is she involved in this case now?

A. No.

Q. She has not been involved in this lawsuit at all?

A. No.

Q. You also mentioned a Mr. Bell. Who was that?

A. Yes. He almost made me wait till the hundred and eighty days was up. In fact, if it hadn't been for Vicki, he would have.

In August, 1979 plaintiff wrote letters complaining of age discrimination to the

---

**13.** Ibid.

**14.** The record does not reveal if, or where, she worked after April 1981.

**15.** See note 3, *supra*.

Department of Labor and to the "U.S. Equal Rights Employment Opportunity Commission." Such letters were posted on the afternoon of August 21, 1979. The one mailed to the EEOC was received, according to its date-stamp, on August 23, 1979. The letter mailed to the Department of Labor is not date-stamped, but could not have been received in Washington earlier than August 22, the day after its posting in Charlotte, North Carolina. The letters both bear on their envelopes the inscription "Attention—Age Discrimination."

A third letter was allegedly sent, but plaintiff is unable to remember anything about its addressee. Plaintiff does admit that it was like the other two and was mailed at the same time. The following appears at page 83, line 12 [16] of plaintiff's deposition:

Q. And you do not recall who the third letter went to? ·

A. No. He just gave me some addresses. I talked to him and he told me to sit down and write and explain it to them.

Q. Would it have been the same letter?

A. It might have had a few words different because I didn't just copy the letter over but it had the main things in it; that they refused me a transfer.

Q. Was that letter written at the same time these letters were, August 20, 1979?

A. Yes.

Q. Was that letter mailed at the same time these letters were mailed?

A. Yes. I mailed all three of them at the same time.

**16.** See note 3, *supra.*

**17.** 29 U.S.C. § 793 provides in full:
(a) Any contract in excess of $2,500 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that, in employing persons to carry out such contract the party contracting with the United States shall take affirmative action to employ and advance in employment qualified handicapped individuals as defined in section 7(7). The provisions of this section shall apply to any subcontract in excess of

Q. These letters appear to bear postmark of August 21, 1979. Is that correct?

A. I think it was August 20th when I wrote it, I think. August 20th was on mine.

Q. So you wrote it one day and mailed it the next?

A. I must have.

Q. And whatever this third letter was is essentially the same as this letter.

A. The same thing, that they just wouldn't let me have a job.

Q. Was it written at the same time?

A. At the same time.

Q. And was mailed at the same time?

A. Yes.

Following the receipt of the letters by the EEOC and the Department of Labor, the Department of Labor referred the matter to EEOC for investigation, sending its copy to that agency.

The allegations of age discrimination were investigated by EEOC and the investigation was closed in February 1980 with the EEOC taking no position on the charge. No investigation or conciliation with respect to the alleged discrimination based on handicap was undertaken at any time.

## DOES 29 U.S.C. § 793 AUTHORIZE A PRIVATE SUIT UNDER THE VOCATIONAL REHABILITATION ACT

■ There is no right to private suit under 29 U.S.C. § 793. Section 503 of the Vocational Rehabilitation Act, (29 U.S.C. § 793) does not expressly provide for a private cause of action.[17] While the Fourth

$2,500 entered into by a prime contractor in carrying out any contract for the procurement of personal property and nonpersonal services (including construction) for the United States. The President shall implement the provisions of this section by promulgating regulations within ninety days after the date of enactment of this section.
(b) If any handicapped individual believes any contractor has failed or refuses to comply with the provisions of his contract with the United States, relating to employment of handicapped individuals, such individual may file a complaint with the Department of Labor. The Department shall promptly investi-

Circuit has not addressed the issue of whether a private right of action may be implied under § 503, the Second, Fifth, Sixth and the Seventh Circuits have recently addressed this issue. Both concluded that a private right of action may not be implied under § 503.

In *Katz v. Spiegel, sub nom, Davis v. United Airlines* (2nd Cir.1981); *Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074 (5th Cir.1980); *Hoopes v. Equifax, Inc.,* 611 F.2d 134, 135 (6th Cir.1979); and *Simpson v. Reynolds Metals Co.,* 629 F.2d 1226 (7th Cir.1980), the Courts noted that the legislative history contemporaneous with the original adoption of § 503 did not discuss whether a private right of action was intended. Therefore, both Courts concluded that the four-part test for implying a private right of action, set forth by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), would have to be applied. The four factors [18] which the Supreme Court directed should be considered are (1) whether plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one; (3) whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff; (4) whether the cause of action is one traditionally relegated to state law in an area which is basically the concern of the states so that it would be inappropriate to infer a cause of action based solely on federal law.

In considering the first *Cort* factor, i.e. whether plaintiff was one of a class for whose especial benefit the statute was enacted, the Fifth Circuit noted that § 503 is "structured as a directive to federal agencies and does not clearly define a right inhering in individual members of a benefitted class ...", Id. at 1080. The Court concluded that the statute requires those who give out federal contracts to obligate contractors to take affirmative steps to employ and advance handicapped persons, but that these "duty-creating phrases" relate solely to the agencies, not to a class of potential plaintiffs, and do not infer a private right of action.

The Court then considered the second factor—legislative intent. The Court noted that legislative history contemporaneous with the initial passage of § 503 was scant, and that there was no discussion of whether a private right of action was created by § 503. The Court also noted that the only explicit statements of Congressional intent were found in connection with later legislation. For example, sections 503 and 504 (29 U.S.C. § 793 and 794) [19] were amended in 1974 to clarify the definition of "handicapped person". During the enactment of these amendments, there were comments on the intended scope of these sections as originally adopted. The Senate Conference Committee on the amendments equated § 504 to § 601 of the Civil Rights Act of

---

gate such complaint and shall take such action thereon as the facts and circumstances warrant, consistent with the terms of such contract and the laws and regulations applicable thereto.

(c) The requirements of this section may be waived, in whole or in part, by the President with respect to a particular contract or subcontract, in accordance with guidelines set forth in regulations which he shall prescribe, when he determines that special circumstances in the national interest so require and states in writing his reasons for such determination.

**18.** Whether we view these factors as "a part of our law" ... or as "merely guides in the central task of ascertaining legislative interest", *Davis v. United, supra,* citing *California v. Sierra Club.*

**19.** 29 U.S.C. § 794 provides in pertinent part:

No otherwise qualified handicapped individual in the United States, as defined in section 7(7), shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978.

1964, 42 U.S.C. § 2000d and § 901 of the Educational Amendments of 1972, 20 U.S.C. § 1681. The conferees noted that, like those sections, § 504 is to be enforced by administrative and judicial means, including a private judicial remedy.

The Committee did not make any specific statement that § 503 would entail a private remedy. It merely noted that "§§ 503 and 504 would be administered in such a manner that a consistent, uniform and effective federal approach to discrimination against handicapped persons would result." See discussion at 611 F.2d at 1081. The Fifth Circuit concluded that these occasional mentions of § 503 did not justify the implication of a private right of action under § 503. Quoting extensively from *Rogers*, the Seventh Circuit wholeheartedly concurred in the Fifth Circuit's analysis.

Amendments made in 1978 were a bit more troublesome, but both the Fifth Circuit and the Seventh Circuit refused to find that the 1978 amendment to the Rehabilitation Act of 1973, 29 U.S.C. § 794a, providing for attorney's fees in any action "to enforce or charge a violation of a provision of this subchapter" necessarily indicated that Congress had intended to create a private right of action under § 503.[20] At most, the Courts concluded, the provision for attorney's fees evidenced an assumption by the 1978 committee that Congress had five years earlier created a private right of action. As the Court said in *Rogers*, however:

An assumption is not a law.

\* \* \* \* \* \*

A statement indicating that section 503 creates a private cause of action was made by a Senate Committee in 1979. "The Committee" in 1978 or 1979 is not the committee that recommended this legislation in 1974. Had this statemen been made in the report of the committee that recommended the legislation, it would indeed be part of the statutory

history. When altered five years later it is mere commentary. Moreover, a committee is not Congress. It cannot create a Congressional intent that did not exist, or amend a statute by a report. Id. at page 1082.

In considering the third *Cort* factor—consistency of a private right of action with the legislative scheme—the Courts concluded that, since § 503 provides a complete administrative scheme to remedy § 503 violations, a private right of action would be inconsistent with the purposes of the legislative scheme. *Rogers*, 611 F.2d at 1085 and *Simpson*, 629 F.2d at 1243. Having reached the conclusion that the statute did not provide for a private cause of action under the first three *Cort* factors, neither Court addressed the fourth factor.

While there have been district court decisions both ways, (*see, e.g. Clarke v. Felec Services, Inc.*, 489 F.Supp. 165, 166 (D.C. Alaska 1980) and the cases cited in footnote 2. of that decision) the Circuit Court decisions cited are well reasoned and should control this case.

### DID PLAINTIFF COMPLY WITH THE REQUIREMENTS OF 29 U.S.C. § 793(b) and 41 CFR 60–741–23

■ Defendant alternatively maintains that, if there is a private right of action under § 503, plaintiff has failed to satisfy her obligation to exhaust her administrative remedies before commencing this action, and cannot proceed in this forum.

Plaintiff's letters to the Department of Labor and the EEOC, copies of which were attached to her deposition, did not claim defendant had discriminated against her by reason of failure to accommodate her handicap. In both letters she states, "I have been discriminated against because of my age". On both envelopes she wrote "Attention—Age Discrimination". 29 U.S.C. § 793(b) provides that an individual who alleges discrimination under the Rehabilita-

---

**20.** 29 U.S.C. § 794a(b) provides in pertinent part:

(b) In any action or proceeding to enforce or change a violation of a provision of this

title, the court, in its discretion, may allow the prevailing party, other than the United States, reasonable attorney's fees as part of the costs.

tion Act of 1973 may file a complaint with the DOL, whereupon the Office of Federal Contract Compliance, (OFCCP) of the DOL shall investigate the complaint and take such action the circumstances may war-rant. 41 CFR 60–741.23 [21] provides that the individual alleging discrimination must file a complaint with the OFCCP within 180 days after the alleged discriminatory act or acts occurred. The OFCCP will investigate the complaint and will attempt to settle it through conciliation. If this fails, the contractor is afforded an opportunity for a formal hearing, at which the OFCCP officer will make recommendations and final action will be taken. If the OFCCP finds that an employer has failed to comply with the regulations of the Rehabilitation Act of 1973, the employer's contract may be cancelled or terminated either in whole or in part by the Federal Government, progress payments may be withheld, or the contractor may be debarred from future contracts.

█ It is well settled that where an administrative remedy is available, plaintiff must first avail herself of it before the courts will act. Vol. 5 Mezines, Stein & Gruff, *Administrative Law*, § 49.01 (Matthew Bender, 1981), 2 Am.Jur.2d, Administrative Law § 595. Otherwise, the courts and the parties lose the benefit of agency's expertise, any record it might develop, and any reconciliation that might have been accomplished. This is particularly true in the area of federal anti-discrimination in employment statutes where federal policy has clearly favored the administrative, reconciliatory policy. See, e.g. Section 706 of the Civil Rights Act of 1964, (42 U.S.C. § 2000e–5), and Section 7(d) of the Age Discrimination in Employment Act, (29

U.S.C. § 626(d)). At a minimum, plaintiff was/is required to allow the OFCCP an opportunity to reconcile the matter. To hold otherwise would totally negate the provisions for administrative remedies clearly required by the statute.

## PLAINTIFF'S CLAIM OF AGE DISCRIMINATION WAS NOT FILED WITHIN THE TIME PERIOD REQUIRED BY 29 U.S.C. § 626(d)

29 U.S.C. § 626(d) provides that a charge of age discrimination shall be filed within 180 days after the alleged unlawful practice occurred. Plaintiff did not do this.

There is no issue as to these facts:

1) Plaintiff quit work on April 10, 1978 to go into a hospital for treatment of her back.

2) Plaintiff attempted to return to work in July, 1978, with a doctor's statement that she was to do no lifting and no bending.

3) When she returned, plaintiff's old department was undergoing extensive changes.

4) Plaintiff was not put back to work and was not transferred or retrained.

5) Plaintiff asserts that all the time she was denied transfer or retraining, in July, 1978, others were being allowed to retrain and transfer to other jobs and other departments.

6) Plaintiff left defendant's plant and took other employment in July, 1978 at a Holiday Inn and, subsequently, with Eckerd's Drugs and Sky City.

---

21. 41 C.F.R. 60–741.23 provides in pertinent part:

   (a) FILING COMPLAINTS. Complaints shall be filed within 180 days of the alleged violation unless the time for filing is extended for good cause shown.

   (f) REFERRAL TO CONTRACTOR. When a complaint concerns an employee of a contractor and the contractor has an applicable internal review procedure, the complaint may be referred to the contractor for processing under that procedure if the employee gives his/her consent. The contractor shall be informed of the elements of the complaint either by being furnished a copy or a sanitized version. The complaint and all actions taken thereunder shall be kept confidential by the contractor. If the contractor is able to resolve the complaint to the satisfaction of the employee prior to the OFCCP investigation, the contractor shall notify OFCCP of the results in writing within 60 days of the referral. The case will be closed upon verification with the employee.

7) Plaintiff's last contact with defendant concerning a job for her was in January, 1979.

8) Plaintiff's complaints were mailed on August 21, 1979 and received for filing in the offices of EEOC and the Department of Labor on or after August 22, 1979.

9) The contents of the complaint letters and plaintiff's deposition refer repeatedly to the events of July, 1978, and not to a discharge in February, 1979.

■ Under the foregoing facts it is plain that the only alleged unlawful practice, if any, on which plaintiff can rely occurred in July, 1978, more than a year before she filed her written complaints with the agencies. Although the Court conceivably could hold that plaintiff's later requests for placement in a job and defendant's failure to provide such a job constituted a continuing violation, or separate violations, the last of these contracts was in January, 1979. Plaintiff's complaint was not filed until the 203rd day, *after the 180 days passed.*

Of course, there is the matter of the termination in February, but the undisputed facts show that although it may not have been until February 22, 1979, that the plaintiff was advised she had been dropped from the defendant's roll of employees, the events of that day play no part in her complaint. She was already working elsewhere and had no concern with the defendant other than to check on her insurance. Obviously, plaintiff has alleged that date since it is the only one which could bring her close to a timely filing. Even that date

is insufficient, however, since none of the plaintiff's papers was sent in time to be filed within the 180 days allowed. (February 22, 1979 to August 22, 1979—181st day or, if the date stamp of August 23, 1979 is taken as the earliest date of receipt, the 182nd day).[22]

Whether the Court views the 180 day requirement of 29 U.S.C. § 626(d) as jurisdictional or as a statute of limitations subject to equitable tolling is immaterial in this case. The plaintiff's quarrel with defendant's actions was a long-standing one. She was familiar with her rights, having filed a complaint against the defendant as early as 1976 with a state agency complaining of discrimination. She had contacted two lawyers.. Her separation from the defendant had lasted over a year before she finally filed her complaint and no basis for equitable tolling of the statute is anywhere apparent.

Defendant is clearly entitled to summary judgment on the handicap complaint of plaintiff.

During the course of this litigation defendant, in its Interrogatory number 4, asked plaintiff for the names and addresses of the persons younger than she whom she contends were given jobs or training for which she had asked (at the Lancaster Plant of Springs Cotton Mills). She has consistently ignored this interrogatory, listing instead lawyers who "told me I had a good case", lawyers no one of whose names appear on the pleadings. Defendant moved for sanctions. This Court cannot allow litigants, *pro se* or otherwise, (espe-

---

**22.** The statute says the charge "shall be filed within 180 days". (29 U.S.C. § 626(d)). The term "file" is defined as, "To deposit an instrument or document with a public officer at his office... To receive an instrument or document officially." Ballentine's Law Dictionary (3rd Ed., 1969) page 471. The receipt, not the mailing, constitutes the filing. Federal courts have considered the receipt date the "filing" date for purposes of Title VII actions Cf. *Silver v. Mohasco Corp.,* 602 F.2d 1083, 1087 (2nd Cir. 1979), and *Williamson v. Bethlehem Steel Corp.,* 488 F.Supp. 827, 830 (W.D.N.Y.1980), a holding consistent with past precedent under other statutes (see the numerous cases cited in 16A

WORDS AND PHRASES 107–110 (West Publishing Co. 1959) and 1980 cumulative supplement, page 12, which hold, almost without exception, that "mailing" is not "filing".) The EEOC Compliance Manual, published by Bureau of National Affairs, at (Section 2.1(f)) (Eff. 5/79) is in agreement, stating: "When measuring the timeliness of a charge, use the date the charge was first *received* by any office of the Commission, including Headquarters. If the charge was first *received* by the Office of Federal Contract Compliance Programs ... use the date the charge was first *received* by OFCCP or FCC." (Emphasis added).

cially one such as plaintiff who is obviously being advised by a lawyer who is too "yellow" to show his face) to ignore the processes of the court. For her failure to respond plaintiff is denied further pursuit in this forum and the complaint should be dismissed.

Defendant's motion for summary judgment is granted.

The complaint is dismissed under Rule 37(b), Federal Rules of Civil Procedure.

AND IT IS SO ORDERED.