Manuel VEGA, et al., Plaintiffs,

v.

NOURSE FARMS, INC.,
et al., Defendants.

No. Civ.A. 98–30180–MAP.

United States District Court,
D. Massachusetts.

Aug. 25, 1999.

J. Paterson Rae, Richard M. Glassman, Western Mass. Legal Services, Springfield, MA, for plaintiffs.

John C. Sikorski, Robinson, Donovan, Madden & Barry, Springfield, MA, Robert E. Wiliams, McGuiness & Williams, Washington, DC, Lorence L. Kessler, Amy Habib, McGuiness Norris & Williams, Washington, DC, for defendants.

## *MEMORANDUM REGARDING DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT*

PONSOR, District Judge.

### I. *INTRODUCTION*

The seven plaintiffs in this case, Manuel Vega, Jose Vega, David Orengo, Ruben Rios, Radames Pacheco, Americo Rodriguez and Miguel Camacho (collectively "plaintiffs"), are migrant farm workers who reside in Puerto Rico. Each is a United States citizen. Defendants, Nourse Farms, Inc. ("Nourse Farms") and its President, Timothy Nourse ("Nourse") (collectively "defendants"), operate a farm in South Deerfield, Massachusetts. This action arises out of defendants' alleged refusal to employ the plaintiffs at the South Deerfield farm for the 1998 growing season and their decision, instead, to employ non-citizen workers. Plaintiffs' seven-count complaint consists of claims under the so-called "H–2A provisions" of the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. § 1101(a)(15)(H)(ii), § 1188 and 20 C.F.R. § 655.0 *et seq.* (Counts I and II), the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1821 *et seq.* (Count III), and various common law contract-based claims (Counts IV through VII). Defendants have moved to dismiss or, in the alternative, for summary judgment as to all of these claims.

For the reasons summarized below, defendants' motion will be DENIED.

### II. *BACKGROUND*

The INA regulates, among other areas of immigration, the admission of non-immigrant aliens into the United States to fill temporary labor shortages. Prior to 1986, the INA made no distinction between agricultural and non-agricultural temporary workers, which were then both referred to as H–2 workers. *See* former 8 U.S.C. §§ 1101(a)(15)(H)(ii) and 1184(c). In 1986, Congress passed the Immigration Reform and Control Act ("IRCA"), which, among other reforms, codified certain aspects of the former H–2 regulatory scheme and divided H–2 workers into two categories, temporary agricultural workers (or "H–2A workers") and non-agricultural workers (or "H–2B workers"). *See* 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), (b) and 1188. The current H–2A regulations are contained in 20 C.F.R. §§ 655.90 through 655.113 and set forth "the requirements and procedures applicable to requests for certification by employers seeking the services of temporary foreign workers in agriculture." 20 C.F.R. at § 655.90(a)(2). The present case involves the application of the H–2A provisions of the INA and regulations promulgated thereunder. *See* 8 U.S.C. §§ 1101(a)(15)(H)(ii), 1188 and 20 C.F.R. §§ 655.90 through 655.113.

Under this statutory and regulatory regime, agricultural employers who anticipate temporary domestic labor shortages may petition the Attorney General for au-

thorization to utilize the services of H–2A workers. *See* 8 U.S.C. § 1188(a)(1); 20 C.F.R. § 655.101. Prior to Attorney General approval, the employer must successfully apply to the Secretary of the United States Department of Labor ("DOL") for certification that

(A) there are not sufficient workers who are able, willing and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

(B) the employment of the aliens in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

*Id.; see also* 20 C.F.R. § 655.90. Absent this two-fold showing, no certification will issue, and the petitioner's H–2A application will not be approved. *See* 8 U.S.C. § 1188(a)(1); 20 C.F.R. § 655.90(b)(2).

An application will be "accep[ted] for consideration" if it meets certain minimum filing criteria. 20 C.F.R. § 655.100(b). Thereafter, the application will be approved or denied in what is termed a "temporary alien agricultural labor certification determination." *Id.* The decision whether to accept an application for consideration and to make the certification determination is ordinarily made by the Regional Administrator (RA) of the pertinent Employment Training Administration (ETA) region. *Id.* at § 655.92.

An agricultural employer must submit its application for H–2A certification less than sixty days prior to the first day on which the employer requires the services of H–2A workers. The application must include a "job offer" that sets forth all of the "material terms and conditions" of the proposed employment, including "those relating to wages, working conditions and other benefits." 20 C.F.R. §§ 655.100(a)(1), (b) and 655.101(b)(1). The offer must also include the dates for which employment is required and the number of workers needed. *Id.* at § 655.101(b)(1). Further specific require-

ments regarding the "[c]ontents of job offers" are extensively detailed in 20 C.F.R. § 655.102.

Within seven days of filing, the Regional Administrator will notify the applicant whether the application is accepted for consideration. *See id.* at §§ 655.101(c)(2), 655.104(a); *see also* 8 U.S.C. § 1188(2). If the applicant is informed that the application does not comply with the regulations, the applicant will have five days in which to file an amended application. *See* 20 C.F.R. § 655.101(b)(2).

An association of agricultural producers may also apply for H–2A certification, but must identify whether it is the "sole employer," a "joint employer" with its members or the "agent" of its members. *Id.* at § 655.101(a)(3). The association must also submit documentation sufficient to enable the Regional Administrator to verify its employer or agency status and identify by name and address each association member who will be an employer of H–2A workers. *See id.*

At the time the employer or association submits the application to the Regional Administrator, a copy of the application must also be submitted to the employer's local public employment office, which will "use the job offer portion of the application to prepare a local job order and begin recruiting U.S. workers in the area of intended employment." *Id.* at § 655.101(c)(4). The local office will also prepare an "agricultural clearance order," which, following the acceptance of the employer's application for consideration, is used to recruit United States workers through an interstate clearance system. *Id.* This system was implemented pursuant to the authority of the Wagner–Peyser Act (passed in 1933), 29 U.S.C. §§ 49 *et seq.,* which established the United States Employment Service within the DOL to create and maintain "a national system of public employment offices." *See also* 20 C.F.R. §§ 652.1 *et seq.* (implementing the Wagner–Peyser Act) and 653.500 *et seq.*

(setting forth current "requirements for acceptance and handling of intrastate and interstate job clearance orders seeking workers to perform agricultural or food processing work."). The system provides employers with a method of recruiting non-local citizen workers when the supply of local workers is insufficient. In the event that local workers are unavailable, a clearance order is sent through the Employment and Training Administration ("ETA") to other state agencies to provide them with an opportunity to fill employment positions.

In addition to government recruitment of United States workers, the employer itself has a statutory obligation to engage in "positive recruitment" within a multistate region of traditional or expected labor supply of qualified United States workers. 8 U.S.C. § 1188(b)(4); 20 C.F.R. §§ 655.103(d), 655.105(a). The term "positive recruitment" is defined as

> the active participation of an employer or its authorized hiring agent in locating and interviewing applicants in other potential labor supply areas and in the area where the employer's establishment is located in an effort to fill specific job openings with U.S. workers.

20 C.F.R. § 655.100. The obligation of positive recruitment "terminate[s] on the date the H–2A workers depart for the employer's place of employment" from their homeland. 8 U.S.C. § 1188(b)(b); see 20 C.F.R. § 655.105.

Following the departure of the H–2A workers, the employer assumes a new obligation under the so-called "fifty-percent rule." 20 C.F.R. § 655.103(e). Under this provision, the employer must provide employment to any qualified United States applicant until fifty percent of the period of the work contract in which H–2A workers are utilized has elapsed. *See id.; see also* 8 U.S.C. § 1188(c)(3)(B)(i). Employment of United States workers pursuant to this rule may result in displacement of the non-citizen H–2A workers. *See* 8 U.S.C. § 1188(c)(3)(B)(6); 20 C.F.R.

§ 655.102(b)(6)(iv). If this occurs, the employer is exonerated from his employment obligations to the displaced worker. *See* 8 U.S.C. § 1188(c)(3)(B)(6); 20 C.F.R. § 655.102(b)(6)(iv). However, the employer must not treat domestic workers hired under this rule "less favorably than H–2A workers." 20 C.F.R. § 655.103(e).

There are two exceptions to the fifty-percent rule. First, the rule is inapplicable if any person or entity "willfully and knowingly withhold[s] domestic workers prior to the arrival of H–2A workers in order to force the hiring of domestic workers under [the fifty-percent rule]." 8 U.S.C. §§ 1188(c)(3)(B)(vii)(I), (II); 20 C.F.R. § 655.106(g). Any employer who has reason to believe that domestic workers were willfully and knowingly withheld for this purpose may file a complaint with the local employment office, which will promptly notify the Regional Administrator. *See* 8 U.S.C. § 1188(c)(3)(B)(vii)(II); 20 C.F.R. § 655.106(g)(1) and (2). Either the local office or the Regional Administrator will conduct an investigation, including interviewing the employer, the person or entity responsible for withholding the workers and the workers allegedly withheld. *See* 8 U.S.C. § 1188(c)(3)(B)(vii)(II); 20 C.F.R. § 655.106(g)(2). The Regional Administrator is then required to issue written findings within thirty-six hours of receipt of the complaint. *See* 8 U.S.C. § 1188(c)(3)(B)(vii)(II); 20 C.F.R. § 655.106(g)(3) and (4).

The second exception to the fifty-percent rule allows agricultural associations that have obtained certification "to refer or transfer workers among its members." 8 U.S.C. § 1188(c)(3)(B)(iv); *see* 20 C.F.R. § 655.106(c) (setting forth specific rules for transfer). A fair reading of the pertinent statutory provision allows referral or transfer of either the H–2A workers or the United States workers. 8 U.S.C. § 1188(c)(3)(B)(iv); *see also* 20 C.F.R. § 655.106(c). However, the statute makes clear that "United States workers referred

or transferred ... shall not be treated disparately." 8 U.S.C. § 1188(c)(3)(B)(v).

An administrative enforcement mechanism is set forth in the statute. "The Secretary of Labor is authorized to take such actions including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment...." 8 U.S.C. § 1188(g)(2). The Secretary may also withhold approval of an employer's H–2A certification following any violation by the employer of "a material term or condition of [a] labor certification with respect to the employment of domestic or nonimmigrant workers." *Id.* at § 1188(b)(2)(A); *see also* 20 C.F.R. § 655.110. Enforcement of the H–2A program, including violations of the positive recruitment and fifty-percent rules, have generally been delegated to the Employment Training Administration (ETA) and its acting Regional Administrator. *See* 20 C.F.R. § 655.110; *see generally* Office of Inspector General of the U.S. Department of Labor Office of Audit, Consolidation of Labor's Enforcement Responsibilities for the H–2A Program Could Better Protect U.S. Agricultural Workers, Report Number 04–98–004–03–321, Issued March 31, 1998 (hereinafter, "OIG Report"), at 17–18; *see also* 29 C.F.R. §§ 501.0 *et seq.* (setting forth administrative enforcement scheme applicable where an H–2A contractual employee-employer relationship exists).

### III. *UNDISPUTED FACTS*

Most of the facts in this case are undisputed. For purposes of the defendants' motion to dismiss, the court, as it must at this stage, will accept as true all reasonable allegations made by the plaintiffs. With respect to defendants' alternative motion for summary judgment, the court, as required, will view all facts in a light most favorable to the plaintiffs and draw all reasonable inferences in their favor.

The plaintiffs, all United States citizens and residents of Puerto Rico, are migrant farm workers of very limited means. Defendant Nourse Farms, of which defendant Timothy Nourse is President, operates a farm in South Deerfield, Massachusetts.

The defendants anticipated a labor shortage at Nourse Farms for the 1998 growing season, beginning March 19, 1998. They had employed five of the plaintiffs, Radames Pacheco, Jose Vega, Manuel Vega, David Orengo and Ruben Rios, in the 1997 growing season. Therefore, on January 15, 1998, the defendants sent letters to each of them in Puerto Rico stating: "We have a job order for work starting on March 19, 1998. If you are interested in work for the 1998 season please contact your local employment office." (Docket No. 8, Exh. 4). Also on that date, the defendants filed an application for H–2A certification with ETA, seeking eight farm workers for the period from March 19, 1998 to December 15, 1998.

Thereafter, the five plaintiffs who received letters from the defendants, as instructed, along with the remaining two plaintiffs, Americo Rodriguez and Miguel Camacho, promptly reported in January to their local employment office to accept defendants' offers. However, they were informed by local employment officials that the defendants' job order had not been entered into the interstate clearance system.

The defendants' job order was not entered into the clearance system until March 6, 1998, at the earliest, due to deficiencies in the defendants' application requiring supplementation and correction. Thus, although plaintiffs repeatedly inquired at their local employment office regarding work at Nourse Farms, they were informed each time that the order had not yet cleared. In fact, the plaintiffs were not informed until March 17, 1998 that defendants' job order had cleared, at which time they notified the Puerto Rico

job service agent that they wished to accept the jobs.

Meanwhile, also at some time on March 17, it appears that the H–2A workers departed from Jamaica to Nourse Farms, to begin employment on the 19th. Thereafter, on March 20, 1998, the Puerto Rico Department of Labor and Human Resources referred the plaintiffs for employment by notifying the Massachusetts Division of Employment Training ("DET") of their acceptance. DET, in turn, passed on the notification to the defendants on approximately March 24, 1998.

On March 27, 1998, defendants informed DET that they had filled their seasonal employment requirements and that they would not require the services of the plaintiffs. On April 1, 1998, the Regional Certifying Officer of ETA sent a letter to Nourse, informing him, in essence, that despite his lack of need for additional workers, he was required under the H–2A statutory and regulatory provisions to hire the plaintiffs pursuant to the fifty-percent rule. The New England Apple Council, Inc. ("NEAC"), an agricultural association of which Nourse Farms was a member, responded to DET's letter on April 3, 1998, alleging that the Puerto Rican workers were improperly withheld in violation of 8 U.S.C. § 1188(c)(3)(B)(vii)(I) and (II). The NEAC also indicated that it would be willing to refer the plaintiffs to another farm. An investigation by DET ensued. On April 21, 1998, DET submitted a full report to ETA, which, in turn, sent written findings to NEAC on April 24, 1998, concluding that the workers were *not* knowingly or willingly withheld in order to force their hire under the fifty-percent rule.

Meanwhile, the Massachusetts Justice Project, Inc. ("Legal Services"), had assumed legal representation of the plaintiffs. On April 15, 1998, plaintiffs' counsel sent a letter to defendants, urging them to comply with the fifty-percent rule. On April 16, 1998, counsel for the NEAC responded by letter, acknowledging its duties under the fifty-percent rule and in-

dicating that it would exercise its alleged rights under the applicable regulations, as an agricultural association, to transfer plaintiffs to other eligible farms.

On April 17, 1998, Legal Services wrote back to counsel for NEAC, noting that defendants' job order was filed by Nourse Farms, not by the NEAC and, therefore, defendants could not take advantage of the regulatory transfer rules available only to. agricultural association applicants. Nevertheless, Legal Services indicated that it would convey the offer of transfer to the plaintiffs. To permit plaintiffs to consider the offer, counsel requested additional information regarding the proposed transfer, including "copies of all open job orders, the job order numbers, the terms and conditions of employment, the number of available openings, the names and addresses of the farms and/or employers and the duration of employment," so that plaintiffs could make an informed decision regarding transfer. (Docket No. 8, Exh. 11). The defendants never responded with the requested information and never followed through on the proposed transfer of the plaintiffs. Although some of the plaintiffs were able to locate a limited amount of alternate farm work on their own, others were not so fortunate.

On May 6, 1998, DET forwarded to DOL's Employment Standards Administration Wage and Hour Division ("WHD") a list of H–2A employers, including Nourse Farms, who failed, according to DET, to comply with the terms and conditions of H–2A certification by:

[1] Refusing to accept and recruit U.S. workers referred through the Interstate Clearance System[;]

[2] Refusal to cooperate with the employment service on the recruitment of U.S. workers[;]

[3] Shown preferential treatment for the alien [workers;]

[4] Non compliance [sic] with the provisions under the 50% rule[;]

[5] Misrepresenting their actual employment needs and working conditions[; and]

[6] Possible discrimination against us [sic] workers[.]

(Docket No. 20, Exh. N). WHD, and apparently ETA, investigated the complaints regarding Nourse Farms. The record does not include findings, if any, by ETA. WHD, however, concluded that the defendants were in violation of AWPA by failing to inform plaintiffs in the job order that plaintiffs might be subject to transfer to other farms due to Nourse Farm's membership in an agricultural association. Nevertheless, no sanctions were imposed on the defendants by WHD or any other department of DOL.

## IV. *PROCEDURAL HISTORY*

### A. *Plaintiffs' Claims*

The plaintiffs, on September 17, 1998, filed a Complaint in this court, asserting seven claims against the defendants. First, the plaintiffs have charged defendants with violations of the INA and regulations promulgated thereunder, alleging that defendants breached the fifty-percent rule by failing to hire the plaintiffs following the departure of the H–2A workers from Jamaica (Count I), or, in the alternative, violated the positive recruitment requirement by declining to hire the plaintiffs prior to departure (Count II). The plaintiffs have also asserted a claim under AWPA, alleging that defendants knowingly provided false and misleading information concerning the terms, conditions and existence of agricultural employment at Nourse Farms (Count III). Finally, plaintiffs also assert common law claims for breach of contract (Counts IV and V), intended beneficiary (Count VI) and third-party beneficiary (Count VII).

### B. *Defendants' Motion*

Defendants have filed a motion to dismiss and, in the alternative, for summary judgment with respect to all of plaintiffs' claims on the following grounds: Counts I and II fail to state a claim, because there is no private right of action under the H–2A provisions. Moreover, even if a private right of action does exist, Counts I and II should be dismissed because plaintiffs cannot establish any violation of either the fifty-percent rule or positive recruitment requirement of the H–2A program. Count III does not state a claim under AWPA, and the facts, even viewed in the light most favorable to plaintiffs, do not show violations thereof. Counts IV, VI and VII are simply the H–2A claims asserted under the guise of common law contract theories and should be disposed of for the reasons stated regarding Counts I and II. Lastly, the court should decline jurisdiction and dismiss Count V, also asserted under state common law, if the federal claims are dismissed.

## V. *DISCUSSION*

### A. *Private Right of Action Under H–2A*

It is clear that the INA does not explicitly grant or deny a private right of action with respect to the H–2A provisions at issue in this case. Therefore, this court is left to determine whether such a right is implied. The United States Supreme Court, in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), set forth four factors to guide courts in determining whether a private remedy is implicit in a statute not expressly providing for one:

> First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' .... that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to employ such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be

inappropriate to infer a cause of action based solely on federal law.

*Id.* at 78, 95 S.Ct. 2080 (emphasis in original) (citations omitted); *see also Royal Bus. Group, Inc. v. Realist, Inc.,* 933 F.2d 1056, 1060 (1st Cir.1991) (noting that these factors "although clearly subordinate to the 'central inquiry' into congressional intent remain useful [a]s guides to discerning that intent. . . ."). The "especial benefit" analysis must focus on the particular provisions at issue. *See Blessing v. Freestone,* 520 U.S. 329, 342, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

■ The *Cort* factors cut in favor of an implied private right of action in this case. First, the H–2A provisions at issue, including the positive recruitment and fifty-percent rules, were clearly promulgated for the particular benefit of United States workers. As observed by the Supreme Court:

> The *obvious point* of this somewhat complicated statutory and regulatory framework is *to provide two assurances to United States workers, including the citizens of Puerto Rico.* First, these workers are given a preference over foreign workers for jobs that become available within this country. Second, to the extent that foreign workers are brought in, the working conditions of domestic employees are not to be adversely affected, nor are United States workers to be discriminated against in favor of foreign workers.

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 596, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) (emphasis added) (referring to pre-IRCA H–2 regulations adopted in 1986 under the H–2A statutory and regulatory scheme). Consistent with this analysis, our Circuit Court of Appeals has noted that "the policy which permeates the immigration statutes [is] that domestic workers rather than aliens be employed wherever possible." *Elton Orchards, Inc. v. Brennan,* 508 F.2d 493, 500 (1st Cir. 1974); *accord* 20 C.F.R. § 655.90(d).

Second, the parties agree that the legislative history regarding Congress' intent to create a private right under the H–2A provisions is scant. However, the following statement made in the legislative history of the IRCA with respect to the withholding of workers is noteworthy:

> If the Department finds that such withholding has occurred, it is required to suspend immediately the application of the 50 percent rule with respect to that certification for that date of need. The Committee intends that this remedy be construed to be *in addition to, and not in lieu of, any other state or federal remedies* which may be available to the employer. . . . If the Department's findings are based on information provided by the employer which the employer knew to be false, *nothing in this section would preclude an injured worker from seeking appropriate relief.*

H.R.Rep. No 99–682(I), at 82, *reprinted in* 1986 U.S.C.C.A.N. 5649, 5686 (emphasis added). Although this history does not significantly tip the judicial scales in weighing the *Cort* factors, the fact that Congress explicitly envisioned that there would be recourse by both employers and workers independent of any administrative remedy certainly suggests that Congress was not greatly troubled by the notion of private avenues of redress under the H–2A provisions.

Third, a private right of action under the H–2A provisions at issue is consistent with the underlying purposes of the legislative scheme, which is to protect domestic workers. The defendants' assertion that a private right of action, in light of the comprehensive enforcement scheme set forth in 29 C.F.R. §§ 501 *et seq.,* would result in piecemeal litigation that would disrupt the legislative scheme is unconvincing. Those regulations pertain to "Enforcement of Work Contracts," and, therefore, provide no remedy to domestic workers like the plaintiffs who never solidified an employee-employer relationship with the defendants. 29 C.F.R. § 501, Subpart B. Indeed, these

provisions are administered by WHD, whereas the H–2A certification provisions, including issues relating to the positive recruitment requirement and fifty-percent rule are administered by ETA. *See* 29 C.F.R. § 501.1(b) and (c). As noted in the OIG Report, "WHD's jurisdiction is limited to actual events transpiring where there is an employer-employee relationship ... [and] if they encounter a situation outside the scope of their jurisdiction, such as a U.S. worker who may have been improperly denied employment by an H–2A employer, a referral would be made to ETA...." *Id.* at 18. The enforcement responsibilities entrusted to ETA, which primarily include placing limitations on existing or future certifications, offer domestic workers denied employment in violation of the fifty-percent rule and positive recruitment requirements no remedy whatsoever.

As ineffectual as the applicable H–2A enforcement mechanisms are as written, they are even less effective in application. According to the Inspector General's 1998 report, the evaluators of these enforcement provisions "did not identify any instances in which ETA had sanctioned employers." OIG Report at 17. This is consistent with the present case, where the defendants were not sanctioned and plaintiffs were left with no meaningful administrative avenue of redress. The fact is, when workers' rights are violated, no one gets sanctioned.

In sum, the H–2A administrative enforcement mechanisms available to plaintiffs under the facts of this case could *not* and, in fact, did not provide them any relief. These procedures in no way supplant the private right of action plaintiffs seek to pursue here. Since there is simply no inconsistency between a private enforcement mechanism and the underlying legislative scheme, the third *Cort* factor favors the plaintiffs.

Fourth, the area of immigration and naturalization clearly has traditionally been entrusted exclusively to the federal government. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 225, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ("The states enjoy no power with respect to the classification of aliens.... This power is committed to the political branches of the government"); *Nyquist v. Mauclet*, 432 U.S. 1, 10, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977) ("Control over immigration and naturalization is entrusted exclusively to the Federal Government, and a State has no power to interfere"). Accordingly, the unique protections afforded to United States workers through the H–2A provisions, which stem from this traditionally federal function, certainly are not rooted in State law. As such, the fourth factor cuts in favor of the plaintiffs.

Finally, the defendants' position directly contradicts the Supreme Court's decision in *Snapp*. There, a number of east coast apple growers faced with a labor shortage for the 1978 harvest sought workers to fulfill their employment needs. *See Snapp*, 458 U.S. at 597, 102 S.Ct. 3260. Pursuant to the growers' applications, job orders were placed on the clearance system for approximately 2,318 workers. *See id.* Ultimately, enough Puerto Rican workers were recruited to satisfy the orders. *See id.* Nevertheless, the growers refused to utilize the services of a substantial number of workers recruited. Some learned that they would not be employed after traveling to the mainland, while others were informed by the DOL to cancel their flights because other workers were being turned away. *See id.*

The Commonwealth of Puerto Rico, as *parens patriae* for the Puerto Rican workers, filed an action against various individuals and companies engaged in the apple industry in Virginia, all of whom had participated in the rejection of the migrant workers. *See id.* at 598, 102 S.Ct. 3260. The complaint sought a declaration of the rights of the Puerto Rican citizens pursuant to the Wagner–Pensey Act, INA (obviously prior to the 1986 IRCA modifications) and the H–2 regulations set forth in former 20 C.F.R. §§ 655.0 *et seq.* These

regulations were substantially similar to those set forth under the H–2A regulations presently at issue. The Virginia growers responded with a motion to dismiss, arguing that the Commonwealth of Puerto Rico did not have standing to bring the action as *parens patriae* for its citizen workers. *See id.* at 599, 102 S.Ct. 3260. The United States District Court for the Western District of Virginia dismissed the action, holding that, although Puerto Rico was capable of asserting a *parens patriae* interest in general, no such action could be maintained under the circumstances presented there. A divided panel of the Fourth Circuit Court of Appeals reversed, holding that Puerto Rico had standing to pursue the action. *See Puerto Rico v. Alfred L. Snapp & Sons, Inc.*, 632 F.2d 365, 370 (4th Cir.1980).

On review, the Supreme Court unanimously held that Puerto Rico had standing to maintain the action. *See Snapp*, 458 U.S. at 599, 610, 102 S.Ct. 3260. Though in the context of the former H–2 scheme, the Supreme Court addressed the regulatory provisions at issue in the present action, including the positive recruitment requirement and fifty-percent rule, concluding that the "obvious point" of the statutory and regulatory framework was to ensure preferential treatment of United States workers over foreign labor. *See id.* at 596, 102 S.Ct. 3260. Additionally, as noted by the Supreme Court, "the Secretary of Labor ... represented that he ha[d] no objection to Puerto Rico's standing as *parens patriae* under these circumstances." *Id.* at 610 n. 16, 102 S.Ct. 3260.

Defendants' efforts to distinguish *Snapp*, while vigorous, cannot avoid the assumption implicit in its holding: the H–2A provisions at issue there, and now in this case, carry a private right of action, whether asserted by Puerto Rico as *parens patriae*, as in *Snapp*, or by the workers themselves directly, as here. The defendants' assertion that a private right of action would conflict with the limited enforcement scheme administered by the DOL is belied by the DOL's own lack of objection to Puerto Rico's standing in *Snapp*.

This court has reviewed and carefully considered other relevant cases that have addressed the private right of action issue in connection with other sections of the INA. *See Lopez v. Arrowhead Ranches*, 523 F.2d 924, 926 (9th Cir.1975) (finding no private right of action under the criminal provisions of the INA against an individual for harboring illegal aliens); *Flores v. George Braun Packing Co.*, 482 F.2d 279, 279–80 (5th Cir.1973) (finding no private right of action under INA provisions setting forth definitions, criminal penalties for harboring illegal aliens and visa eligibility for illegal aliens); *Chavez v. Freshpict Foods*, 456 F.2d 890, 893–94 (10th Cir. 1972) (finding no private right of action under INA provisions setting forth definitions, criminal penalties for harboring illegal aliens and visa eligibility for illegal aliens); *United States v. Richard Dattner Architects*, 972 F.Supp. 738, 742–46 (S.D.N.Y.1997) (finding no private right of action under H–2B program); *Garrison v. OCK Constr. Ltd.*, 864 F.Supp. 134, 135–37 (D.Guam 1993) (finding that workers had standing to sue growers pursuant to a unique H–2 provision applicable to Guam); *International Union of Bricklayers v. Meese*, 616 F.Supp. 1387, 1397 n. 8. (N.D.Cal.1985) (finding implied right of action to sue Immigration and Naturalization Service challenging agency guidelines); *Dowling v. United States*, 476 F.Supp. 1018, 1020–21 (D.Mass.1979) (finding no private right of action under INA definition section and DOL enforcement section); *Collyard v. Washington Capitals*, 477 F.Supp. 1247, 1254–56 (D.Minn.1979) (finding no private right of action under INA definition section). None of these decisions construes the specific provisions at issue in the present case. To the extent their reasoning might be applied here to reach a different result, this court finds them unpersuasive, particularly in view of *Snapp*.

For the reasons summarized above, the court finds that plaintiffs have an implied private right of action under the H–2A provisions. As noted, the "central inquiry" must be directed at Congressional intent. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 574–76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Here, the private civil action asserted provides the only effective tool to secure the rights of workers whose protection was the explicit goal of the statute enacted by Congress. The Supreme Court itself in *Snapp* presumed the existence of such a remedial tool. Plaintiffs should not be barred from using it.

## B. *Defendants' Other Challenges To The H–2A Claims*

### 1. *Fifty–Percent Rule*

Defendants claim that they are entitled to summary judgment as to plaintiffs' fifty-percent rule claim because the facts, viewed in a light most favorable to plaintiffs, establish that they were excused from their obligations under that rule. Specifically, defendants allege that the NEAC "repeatedly and unequivocally offered on behalf of Nourse Farms to refer or transfer [plaintiffs] to employment with other NEAC-member farms," which the plaintiffs "repeatedly refused." (Docket No. 9 at 17–18). According to defendants, this offer entitles the NEAC, as an association, and, in turn, the defendants, as members thereof, to shelter from the fifty-percent rule. *See* 8 U.S.C. § 1188(c)(3)(B)(iv) and 20 C.F.R. § 655.106(c).

■ Contrary to defendants' assertions, the exception on which they rely is inapplicable for at least two reasons. First, an agricultural association's involvement in the H–2A process derives from its application for H–2A certification as a "sole employer," "joint employer with its employer-members" or as an "agent of its employer-members." 20 C.F.R. § 655.101(3). With its application, the association must submit documentation that will allow verification of its employer or agency status and a list of the names and addresses of each member that intends to employ H–2A workers. *See id.* An association that meets these regulatory requirements, may, in order to avoid the fifty-percent rule, transfer domestic workers among its members as long as the terms and conditions of employment do not diverge from those received by the H–2A workers. *See* 8 U.S.C. § 1188(c)(B)(v) and 20 C.F.R. § 655.106(c)(2).

In this case, the parties' submissions do not reflect that the NEAC submitted an application in any of the capacities authorized by regulation, offered verifying documentation and member lists at the time of defendants' application or otherwise involved itself in Nourse Farms' certification. As such, the court cannot find—at this early point in the proceedings—that the association-transfer exception applies to the defendants in this case. The defendants' assertion that ETA's clarification letter of June 12, 1998, "acknowledg[ed] that NEAC lawfully could refer [plaintiffs]" pursuant to the association-transfer exception is in error. The letter simply set forth the circumstances under which transfer was allowed under the regulation, along the lines set forth by the court above. It said nothing regarding defendants' actual *authorization* to transfer under the circumstances of this case.[1]

Second, even if the defendants were authorized to take advantage of the association-transfer exception, the facts of record do not indisputably establish that they ever actually did so. Defendants' representations that they "repeatedly and unequivocally" offered to transfer the plaintiffs and plaintiffs "repeatedly" refused is not consistent with the record. Defendants, through their attorney, communicat-

---

**1.** It is true that WHD determined that defendants violated the AWPA disclosure rules by not informing the plaintiffs that they might be transferred. However, the determination that defendants had an obligation to notify plaintiffs of an intent to transfer them does not constitute evidence that defendants were legally entitled to make transfers.

ed only once to plaintiffs' counsel that they wished to exercise their purported right to transfer the plaintiffs. Contrary to defendants' assertions, plaintiffs *never* refused the possibility of a transfer, but, instead, through Legal Services, requested information regarding the location of the new work sites and the proposed terms and conditions of employment. Defendants never responded. Plaintiffs had a right to know, at the very least, where they were being transferred, what they would be doing and how much they would be paid before they made a decision.

It is worth noting that the defendants, if they had really desired to accommodate the plaintiffs, could easily have transferred the foreign workers and placed the Puerto Rican workers at their farm. This action would have been consistent with the clear policy of the H–2A program, which is to ensure preferential treatment of domestic laborers over foreign workers, and with the terms of the H–2A statutory and regulatory scheme. *See* 8 U.S.C. § 1188(c)(3)(vi) and 20 C.F.R. § 655.102(b)(6)(iv) (exonerating employers from liability for displacement of H–2A workers in complying with the fifty-percent rule). Instead, the record indicates that the defendants addressed the plaintiffs' complaints first by making unsupported allegations of willful withholding of workers, and then by offering empty promises of transfer to undisclosed locations subject to undisclosed employment terms. If these facts are proved at trial, plaintiffs will be entitled to prevail.

### 2. *Positive Recruitment*

■ Defendants next claim that plaintiffs' positive recruitment claim should be dismissed on two grounds. First, relying on the definition of the term "positive recruitment" set forth at 20 C.F.R. § 655.100, defendants argue that positive recruitment does not encompass a duty to *hire* domestic workers, but only requires "locating and interviewing" applicants. This dubious analysis, however, ignores

the explicit terms of the pertinent provision and is inconsistent with the policy underlying the H–2A program. Section 655.100 is clear that the ultimate goal of "locating and interviewing" domestic workers is "to fill specific job openings with U.S. workers." *Id.; see also* 20 C.F.R. § 655.103(c) ("No U.S. worker will be rejected for . . . employment for other than a lawful job-related reason"). Similarly, the policy underlying the H–2A program as a whole is that "[domestic] workers are given a preference over foreign workers." *Snapp,* 458 U.S. at 596, 102 S.Ct. 3260. Adoption of defendants' suggestion that they only need to locate and interview, but not employ, United States workers would make a mockery of this policy.

Next, the defendants claim that, even if positive recruitment entails actual hiring, plaintiffs still cannot establish that defendants violated this requirement. Specifically, the defendants claim that any positive recruitment obligation ended when the H–2A workers departed from Jamaica on March 17, 1998, prior to any referral by the Puerto Rico Department of Labor and Human Resources. This argument has some force. Indeed, it is possible that this case will ultimately rise or fall on the application of the fifty-percent rule.

■ The disputed factual record however er makes disposition of the case impossible on this point at this time. Plaintiffs' acceptance of the job order on March 17, 1998 imposed a duty on defendants to hire them contingent upon the absence of any legitimate "job related reason" for *not* hiring them. 20 C.F.R. § 655.103(c). The record in this case is murky as to whether the foreign workers departed before or after plaintiffs accepted. Therefore, a dispute of fact exists as to whether defendants' duty to hire plaintiffs arose in the "positive recruitment" period or the "fifty-percent rule" period. Resolution of this dispute must await determination by the factfinder, and defendants' motion must, therefore, be denied as to Counts I and II.

**346**

## C. *AWPA Claim*

The plaintiffs alleged that defendants violated various provisions of AWPA, including 29 U.S.C. §§ 1821(a), (f) and 1822(c) in two ways: first, by failing to disclose to plaintiffs that Nourse might seek to transfer them to another work site; and second, by refusing to employ the plaintiffs after they accepted defendants' offer. Section 1821(a) requires that an employer of migrant workers ascertain and disclose in writing to migrant workers various items of information at the time of recruitment, including the place of employment, wage rates, the period of employment, transportation and housing information and benefits. Section 1821(f) provides that no employer "shall knowingly provide false or misleading information to any migrant agricultural worker concerning the terms, conditions or existence of agricultural employment required to be disclosed under [AWPA]." Lastly, Section 1822(c) states that no employer "shall, without justification, violate the terms of any working arrangement made ... with any migrant agricultural worker."

With respect to plaintiffs' first position, defendants contend that their *omission* from the job order of information that they might seek to transfer the plaintiffs (which defendants mistakenly believed they had a right to do) does not violate the statutory requirement that they cannot *"provide* false or misleading information." This argument is unpersuasive. Silence, in many circumstances, can be even more misleading than direct misrepresentations. Indeed, under the facts on record in this case, a factfinder could certainly conclude that the plaintiffs were willfully misled into believing that they would be employed at Nourse Farms, which ultimately did not occur.

Moreover, defendants' alleged conduct is precisely the type of recruiting tactic Congress sought to eliminate through AWPA and its predecessor statute, the Farm Labor Contractor Registration Act.

> In the case of most migrant agricultural workers this recruitment and the accompanying disclosure will occur before the worker leaves his permanent place of residence.... The Committee wishes to ensure that workers to the greatest possible extent have full information about where they are going and what the conditions will be when they arrive, before they begin the journey.

H.R.Rep. No. 885, 97th Cong., 2d Sess., 14, reprinted in 1982 U.S.C.C.A.N. 4547, 4560. Thus, it is not surprising that WHD has already determined that defendants, through their silence regarding the intention to seek a transfer, violated AWPA. Plaintiffs are entitled to their day in court on this claim.

For similar reasons, the court finds that a reasonable factfinder could also conclude that defendants failed to supply the requisite information under section 1821(a) and willfully misled the plaintiffs about the "existence" of jobs at Nourse Farms in violation of section 1821(f).[2] Accordingly, defendants' motion to dismiss plaintiffs' AWPA claim must be denied.

## D. *Common Law Claims*

Defendants' arguments in favor of dismissal of plaintiffs' common law claims for breach of contract (Counts IV and V), intended beneficiary (Count VI) and third-party beneficiary (Count VII), are concededly hinged upon the viability of the H–2A claims. Because the court has concluded that those claims are trialworthy, defendants' motion to dismiss and for summary judgment with respect to the common law claims must also be denied.

---

**2.** The court has already determined that the facts on record do not establish that a contractual employee-employer relationship existed between plaintiffs and defendants.

Thus, there is no evidence at this time to conclude that defendants breached any "working arrangement" with the plaintiffs in violation of section 1822(c).

## VI. *CONCLUSION*

For the reasons set forth above, defendants' motion to dismiss and in the alternative for summary judgment is hereby DENIED.

A separate order will issue.